**STATE of Tennessee**

v.

**Daniel Allyn HOOD.**

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

July 17, 2006 Session.

Nov. 30, 2006.

Permission to Appeal Denied by
Supreme Court March 5, 2007.

David L. Raybin, Nashville, Tennessee, for the appellant, Daniel Allyn Hood.

No brief filed on behalf of the appellee, State of Tennessee.[1]

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Daniel Allyn Hood, (DOB: 12/05/89), a juvenile, was found to be delinquent by the Sullivan County Juvenile Court. The order of that court placed temporary custody of Hood with the Department of Children's Services ("DCS") "for an indefinite period of time." The defendant appealed to the trial court, which, after a jury trial, found the defendant to be delinquent on the basis that he had committed the adult offenses of kidnapping and aggravated rape. The order of the trial court awarded Hood's custody to DCS, "determinately until his 19th birthday." The defendant appeals, asserting that the trial court's decree of a determinate commitment, rather than an indefinite commitment, is erroneous and a violation of the United States and Tennessee Constitutions. The defendant also raises several issues with respect to the propriety of certain jury instructions. We affirm.

I.

On August 11, 2003, T.B. ("the victim"), who was 14 years old at the time, made arrangements to spend the night at the defendant's house. The defendant was 13 years old. The victim and the defendant are first cousins and, prior to this night, apparently had a close and loving familial relationship. The defendant's father, Allyn Hood, picked up the victim at her house on his way home from work that night. The victim arrived at the defendant's house at approximately 10 p.m. The defendant and 17–year–old Robert Sanico were at the house. Sanico was a friend of the defendant and the victim. Tasha Collins, another cousin of the defendant and the victim, was also present at the house that night. Collins was there babysitting three young children. The three children were in bed by the time the victim arrived.

The horrible events of that evening began to unfold after the defendant's father retired to his bedroom. Shortly thereaf-

1. This Court granted three separate motions filed by the State requesting additional time to file its brief. Our first order extended the State's filing time from January 17, 2006 through February 16, 2006. Our second order extended the time through March 20, 2006, and our third order extended the time through April 19, 2006. In the third order, we stated that no further extensions would be granted. On April 28, 2006, the State, having failed to meet the April 19 deadline, filed a motion requesting that we accept its late-filed brief. We denied this motion. Accordingly, this case was submitted for decision on the record and the appellant's brief only.

ter, Collins went to take a shower in a bathroom located near the father's bedroom. The victim was on a computer in the kitchen/living room area. The defendant and Sanico were in the defendant's bedroom, which is located on the opposite side of the house from the father's bedroom.

Sanico went out to where the victim was and told her that the defendant wanted to see her in his bedroom. The victim remained seated at the computer. She told Sanico that if the defendant wanted her for something, he could yell "come here," or he could come and tell her what he wanted. Sanico went back to the defendant's bedroom. The victim testified that she next heard the defendant and Sanico laughing, "discussing something," and "sneaking around." On a previous occasion, the defendant and Sanico played a prank on Collins by restraining her to a chair with duct tape. Because the victim had heard about this earlier prank, and because the victim was now seated in the same chair, she stated that she thought the defendant and Sanico might be preparing to play the same prank on her.

The defendant entered the living room and sat down on the couch. Next, Sanico entered the room, and both of them began chasing the victim around the kitchen. They were laughing. The defendant and Sanico caught the victim and, according to her, forcibly carried her to the couch. The victim, still believing this to be an innocent prank, told the defendant and Sanico that they were being "childish and stupid." The victim testified that she tried to "fight them off" but was unsuccessful. She stated that the defendant and Sanico held her face down on the couch and, using duct tape, tied her wrists together behind her back.

The defendant and Sanico then carried the victim to the defendant's bedroom.

She was placed face down on one of the beds in the room. The victim testified that both the defendant and Sanico continued to laugh. She stated that she began to kick them, and that, in response to this kicking, "somebody grabbed [her] legs and held them together." Either the defendant or Sanico then placed a strip of duct tape across the victim's eyes. A piece of tape was next placed over her mouth. The victim testified that she could no longer see or speak. Her ankles were then taped together. The victim stated that she felt two hands holding her ankles together while the other individual applied the tape to her ankles.

The victim was then turned over onto her back. Her shirt and bra were pulled up, exposing her breasts. The majority of her upper body was then covered with duct tape. Next, the victim's shorts and underwear were pulled down. Tape was placed over her lower body, including her vaginal area. The victim stated that she was nervous, and that the defendant and Sanico were still laughing.

The victim next testified to hearing Sanico tell the defendant to get a toilet plunger and cellophane. The defendant retrieved a plunger from the bathroom connected to his bedroom. The victim then heard the door to the defendant's bedroom open and shut. At this point, either the defendant or Sanico exited the bedroom and retrieved the cellophane from the kitchen. The duct tape that was tying her ankles together was then removed. The victim testified that she began to kick. In the struggle, she was flipped back onto her stomach, face down. She testified that the defendant and Sanico restrained her legs. Her legs were then pulled apart, and each ankle was taped to the side of the bed frame.

Collins, who had finished taking her shower by this time, knocked on the door

to the defendant's bedroom. According to the victim, some sort of cover or blanket was thrown over her body. The defendant opened the door. Collins asked the defendant for the password to the computer in the kitchen/living room area. The defendant told Collins the password and closed the door. Collins testified that she did not see the victim at that time.

The cover or blanket was then taken off of the victim. Sanico inserted the handle of the plunger, which had been wrapped in the cellophane, inside the victim's vagina. Sanico asked the defendant if he wanted to do it himself. The defendant answered, "No, man, that's my cousin." After the plunger was taken out of the victim's vagina, a liquid was poured onto her body. According to the victim's testimony, the defendant and Sanico stated that the liquid was Sanico's urine. Later testimony would suggest that the liquid was actually Kool Aid.

The defendant later cut the tape from the victim's wrists. The victim immediately removed the tape from her eyes and mouth. The victim next cut the tape that was restraining her ankles to the bed. She testified that the defendant and Sanico began watching television as if nothing had occurred. The victim walked out of the defendant's bedroom with 70% of her body covered in duct tape. She encountered Collins and asked Collins to retrieve her clothes from the defendant's bedroom.

The victim then called a friend and asked the friend to pick her up. The friend arrived about five minutes later and took her to the hospital.

## II.

In September, 2003, the juvenile court held a hearing to determine if the defendant or Sanico or both should be transferred to criminal court to be tried as an adult. The court found that "[t]here are reasonable grounds to believe the offenses of aggravated rape and aggravate[d] kidnap[p]ing were committed by both minors either as principal or as an aider and abetter." The court determined that Sanico should be prosecuted as an adult, and that the defendant should be tried as a juvenile.

Following a hearing, the juvenile court found the defendant to be delinquent because of his commission of the adult offenses of aggravated kidnapping and aggravated rape. In its order, entered August 19, 2004, the juvenile court awarded temporary custody of the defendant to DCS, "for an indefinite period of time."

Citing T.C.A. § 37–1–159,[2] the defendant filed a notice of appeal, requesting a *de novo* trial by jury[3] in the Sullivan County Criminal Court ("the trial court"). Three days later, the defendant filed a

---

**2.** T.C.A. § 37–1–159 (2005) reads, in pertinent part, as follows:

(a) The juvenile court shall be a court of record; and any appeal from any final order or judgment in a delinquency proceeding, filed under this chapter, ..., may be made to the criminal court or court having criminal jurisdiction that shall hear the testimony of witnesses and try the case de novo....

**3.** The defendant's brief frequently mentions the fact that he appealed the juvenile court

order to take advantage of his constitutional right to trial by jury. The Tennessee Supreme Court recently held that a juvenile does not have a right to a jury trial on a *de novo* appeal brought under T.C.A. § 37–1–159(a). *State v. Burns*, 205 S.W.3d 412, 2006 WL 2716871, at *5 (Tenn.2006). The defendant, pursuant to Tenn. R.App. P. 27(d), filed a letter advising the Court of the *Burns* decision, in which he states that the *Burns* case has no relevance to the issues in the instant case. We agree and deem it unnecessary to further discuss that case.

motion for a temporary disposition or release pending the appeal. The trial court held a bond hearing on September 10, 2004. The defendant was thereafter released on a bond of $250,000.

The trial court held a *de novo* jury trial in December, 2004. Testimony was heard from several witnesses, including the victim, the investigating detective, the defendant's father, and Sanico. The defendant did not testify. The jury found the defendant guilty of kidnapping and aggravated rape. At a subsequent hearing to determine the appropriate disposition of the defendant, the trial court found as follows:

First, [the defendant], is an intelligent young man, having an IQ . . . a tested IQ of 119, placing him in the high average range.

Second, the [defendant] is, obviously, an athletic young man, having participated in several sports.

Third, he's apparently a friendly young man who gets along well with his peers.

Fourth, he is now fifteen years, one month, and twenty-two days old.

Fifth, he is large for his age, having apparently inherited that trait from his father.

Sixth, he appears to be a follower rather than a leader.

Seventh, he participated in the kidnap[p]ing and the aggravated rape of his first cousin, in his own house, duct taping approximately seventy percent of her skin surface. Penetrating her vagina with a bathroom plunger, which he wrapped in saran wrap to form a condom, and this is the only sexually deviant behavior that there is any evidence that he has ever participated in.

[The defendant] has consistently downplayed his roll [sic] in the offenses, placing the blame on the older co-defendant who has entered a plea of guilty and is serving the sentence of ten (10) years in the State Penitentiary, as I recall.

Next, [the defendant] failed to protect his cousin when he could have easily done so, being in his own home, having his father just across the house from them. [The defendant] has shown virtually no remorse for the offenses in which his first cousin was the victim. These offenses being extremely cruel and vile. The prior sexual history, while extensive for his young age, does not appear to be remarkable. Having begun to masturbate, and when he learned about sex, and having engaged in exploratory sexual activity with other males, and heterosexual activity with girls of about his own age, and having viewed pornography. While not proper or legal such activity is not unusual in today's world. In the day when I grew up, boys thought about girls but did not act out those desires until much later.

Next, his behavior while sexual, was also violent in that the victim was abused by the placement of the duct tape over approximately seventy percent of her skin surface, and was, by the testimony at the trial, very painful to have it removed.

[The defendant] is described by the [DCS's] Assessment as being a pseudo-socialized child exploiter, that is that he desired sexual pleasure through exploitation of his victim. This diagnosis includes the fact that the offender often rationalizes the offense with little guilt or remorse. In this case he has placed the blame on the victim and on the co-defendant, and has consistently minimized his role in the commission of the offenses.

[The defendant] has been assessed by the [DCS's] Assessors, as a low to moderate risk sex offender, who is clearly in need of therapy in a sex offender's pro-

gram in order to, first of all, minimize the possibility of recidivism to the greatest degree humanly possible, and to protect others from the same type of abuse, and/or similar unacceptable behaviors, and finally, and very importantly, to set him on the road to a productive and socially proper adulthood.

The issue then becomes how this can best be accomplished. In a residential program in the custody of the State of Tennessee or ... on probation in the custody of his father or his mother.

As to his mother, there has been no proof regarding the propriety of her home, or her circumstances except that she participated in the violation of this Court's Order by taking him to basketball games to play basketball after school hours, as required by the school, without getting this Court's approval, which would have been glad to have given, if his parents had asked for it. The father's home where [the defendant] lived, where the offense occurred, is more problematical. It is clear that lack of parental supervision contributed directly to the circumstances of these offenses. Letting children of the opposite sex sleep over at the home, with the girls sleeping in the same bed with the son is clearly and unequivocally child neglect at the least, and contributing to the delinquency of a minor, at the most. The father's expert witness, Dr. Charlton Stanley, who is a well qualified psychologist, with extensive experience, testified as to the long laundry list of matters which must be corrected before the child can be returned to the home. While there has been some effort in that regard, the Playboy Magazines have been removed from the home, and other steps have been taken, it does not appear that the father has made any substantial effort to alter the living conditions. It does not appear that the fa-

ther can reasonably supervise this child or he would ... let's see ... or that he would have to be supervised in order to comply with the conditions of his own expert who said they must compl[y] with prior to the return of the child to the home. Thus, it is the judgment of the Court in this case that these serious crimes against the person of his own first cousin, that [the defendant] shall go immediately into the custody of the Tennessee ... of the State of Tennessee for entry into the residential program at Mountain View Youth Development Center or at such other facility as the State may choose. That [the defendant] will undergo all counseling and treatment required for his rehabilitation. That he will go into custody of the State immediately at the conclusion of this hearing. That no bond shall be allowed in the event of an appeal, as an appeal would be ... would require such a long period of time that he would likely never be amenable to any sort of treatment or rehabilitation if that should occur. And third, that the custody shall be determinate and shall continue until he reaches the age of nineteen.

A subsequent order of the trial court awarded temporary custody of the defendant to DCS, "determinately until his 19th birthday." This appeal by the defendant followed.

### III.

The matters raised by the defendant present the following issues for our review:

1. Whether the trial court erroneously imposed a determinate commitment, rather than an indefinite commitment.

2. Whether the principles of equal protection, double jeopardy, and due process under the United States and Tennessee Constitutions prohibit the trial

court's imposition of the determinate commitment.

3. Whether the trial court committed reversible error by including the *mens rea* of "recklessly" in the aggravated rape jury instruction. Furthermore, whether the trial court erred in charging the *mens rea* element of aggravated rape in the disjunctive form.

4. Whether the trial court committed reversible error by including an improper definition of "knowingly" in the kidnapping jury instruction. Furthermore, whether the trial court erred in charging that definition of "knowingly" in the disjunctive form.

## IV.

■ The defendant first argues that the trial court erroneously ordered that he be committed to the custody of DCS for a *determinate* period of time. He contends that the determinate commitment was error because (1) "[t]here was no substantial evidence justifying the harsh sentence"; (2) the commitment was punitive in nature; and (3) an indefinite commitment, rather than a determinate commitment, would be in the defendant's "best interest."

The only question for us with respect to this first issue is whether the trial court properly ordered the defendant to serve a determinate commitment. The facts material to this question are not in dispute; therefore, the subject issue raises a question of law. *State v. Mays,* No. W1999–01499–COA–R3–CO, 2000 WL 705979, at *1 (Tenn. Ct.App. W.S., filed May 26, 2000). Accordingly, our standard of review is *de novo* with no presumption of correctness attaching to the legal conclusions of the trial court below. *S. Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993); *Mays,* 2000 WL 705979, at *1.

■ When a child is adjudged delinquent, "the court may make any of the following orders of disposition best suited to the child's treatment, rehabilitation and welfare": the child may be (a) placed on probation, (b) placed in a facility for delinquent children, (c) committed to the custody of DCS, (d) ordered to pay a fine, (e) ordered to perform community service, or (f) ordered to make restitution. T.C.A. § 37–1–131(a), (b) (2005). The commitment of delinquent children to the custody of DCS is further addressed in T.C.A. § 37–1–137 (2005), which, in pertinent part, provides as follows:

(a)(1)(A) An order of the juvenile court committing a delinquent child to the custody of [DCS] shall be for an indefinite time.

(B) ... If a juvenile offender is tried and adjudicated delinquent in juvenile court for the offense of first degree murder, second degree murder, *aggravated rape,* rape of a child, aggravated sexual battery, especially aggravated kidnapping, aggravated robbery, especially aggravated robbery, aggravated arson, attempt to commit first degree murder, or violations of § 39–17–417(b), (i) or (j), or has been previously adjudicated delinquent in three (3) felony offenses arising out of separate criminal episodes at least one (1) of which has resulted in institutional commitment to [DCS], or is within six (6) months of the child's eighteenth birthday at the time of the adjudication of the child's delinquency, *the commitment may be for a determinate period of time* but in no event shall the length of the commitment be greater than the sentence for the adult convicted of the same crime, nor shall such commitment extend past the offender's nineteenth birthday. Commitment under this sec-

tion shall not exceed the sentences provided for in title 40, chapter 35, and in no event shall a juvenile offender be sentenced to Range II or Range III. (Emphasis added). T.C.A. § 37–1–137(a)(1)(B) provides that a juvenile court may commit a delinquent child to the custody of DCS for a determinate time only under three circumstances: (1) if the child commits one of the offenses specified in the statute; (2) if the child has been previously adjudged delinquent for three felony offenses; or (3) if the child is within six months of his or her 18th birthday at the time of the adjudication of the child's delinquency. *Id.* The proof reflects that the second and third circumstances do not apply in this case. However, the first circumstance is clearly applicable. The statute specifically lists aggravated rape as one of the offenses for which a juvenile may receive a determinate commitment. *Id.* On *de novo* appeal, the trial court tried and adjudged the defendant delinquent for the offenses of kidnapping and *aggravated rape.* This is the only "substantial evidence" necessary to justify the trial court's determinate commitment. No other justification or consideration is required. The trial court had the authority to commit the defendant for a determinate period of time. We therefore hold that the trial court's imposition of the determinate commitment was within the trial court's statutory authority.

█ We further note that, even if we were to agree, which we do not, that other "substantial evidence" was necessary to justify the trial court's imposition of the determinate commitment, we would find

that the record before us contains such evidence. There is evidence that the defendant blamed the events of August 11, 2003 on Sanico and the victim. There is also evidence that the defendant showed little remorse for what happened. Thus, there is evidence suggesting that the defendant is in need of extensive treatment and rehabilitation. The record simply does not support the defendant's contentions challenging the propriety of the trial court's determinate commitment.

## V.

### A.

The defendant next argues that the trial court's imposition of the determinate commitment violated his constitutional rights, *i.e.,* his right to equal protection, due process, and against double jeopardy. He argues that the determinate commitment is, in the defendant's language, a "more severe sentence" than the juvenile court's indefinite commitment, and that the Tennessee and United States Constitutions prohibit a harsher sentence on *de novo* appeal. Our analysis of this issue begins with the obvious question—is the trial court's determinate commitment, in fact, "more severe" than the juvenile court's indefinite commitment?

An indefinite commitment requires that a juvenile adjudged delinquent remain in the custody of DCS until he or she has completed the required programs and is fit for "home placement"[4] or discharge. *See* T.C.A. § 37–1–137(c)(1),(g)(1–2). There is an element of discretion and uncertainty as

---

4. "Home placement" refers to a juvenile offender's move from a residential treatment facility to the juvenile's home "under the continuing supervision of the department." T.C.A. § 37–1–137(c)(1). The first 30 days after the juvenile returns home are considered a trial period in which DCS retains legal custo-

dy. *Id.* After successful completion of the 30-day trial period, the juvenile is officially placed on "home placement" status. *Id.* DCS continues to supervise the juvenile, but its legal custody of the juvenile is terminated. *Id.*

to the exact length of an indefinite commitment. *See id.* On the other hand, in a determinate commitment, the court sets a specific date for the juvenile's release or a specific period of time in which the juvenile is to remain in the custody of DCS. The determinate commitment may not exceed the sentence that an adult would receive if convicted of the same crime, and the commitment may not extend beyond the juvenile offender's 19th birthday. T.C.A. § 37–1–137(a)(1)(B). In this case, the defendant was committed until he reached the age of 19.

In our judgment, the fact that a determinate commitment is for a specific period of time does not necessarily make it a more severe sentence than an indefinite commitment. A juvenile committed for an indefinite time, who does not progress well in his or her treatment and rehabilitation, can theoretically remain in the custody of DCS for a longer period of time than a juvenile committed for a specific period of time. Additionally, we note that a determinately-committed juvenile is not subjected to more severe daily treatment or programs. The statute does not distinguish between the programs and treatments made available to a juvenile committed for a determinate time and those afforded a juvenile committed for an indefinite time. Furthermore, the defendant's counselor testified that the defendant would complete the exact same counseling and rehabilitation programs, irrespective of whether he was committed indefinitely or determinately.

T.C.A. § 37–1–137(c)(1) provides the process that the DCS commissioner or designee ("the commissioner") must follow to make a home placement of a juvenile who is committed for an indefinite time. If the commissioner is of the opinion that a juvenile with an indefinite commitment is fit for home placement, the commission-

er must notify the committing court at least 15 days prior to the proposed date of placement. *Id.* The committing court has that 15–day period to object to the home placement or to set a hearing regarding the placement. *Id.* If the court makes no objection or sets no hearing during this period, the court will be deemed to have assented to the home placement. *Id.* If the committing court objects, the commissioner must consult with the court regarding the placement. *Id.* If the commissioner and the court cannot reach an agreement, the commissioner "shall" request a hearing before a three-judge panel, a panel which does not include the committing judge. *Id.* The panel must hear and resolve the controversy within 30 days of receipt of the commissioner's hearing request. *Id.*

T.C.A. § 37–1–137(c)(2) then goes on to delineate the home placement process for those juveniles that have been given determinate commitments. If the commissioner is of the opinion that a juvenile with a determinate commitment is fit for home placement, the commissioner must request a hearing before the committing judge. *Id.* The request must include specific reasons and recommendations for the home placement. *Id.* The district attorney general must also receive a copy of the request. *Id.* If the committing court and district attorney general have no objection, the court may order home placement without a hearing. *Id.* If the court or district attorney general object to the home placement, the court must schedule a hearing within 15 days of receipt of the request. *Id.* After the court conducts the hearing, it may order that the juvenile's commitment to DCS be continued or it may decree the home placement of the juvenile. *Id.* This decision by the court is appealable. *Id.*

The procedures that DCS must pursue to discharge a juvenile offender are virtu-

ally the same as those necessary to make a home placement. The statute again distinguishes between the discharge process for an indefinitely-committed juvenile versus the discharge process for a determinately-committed juvenile. *See* T.C.A. § 37–1–137(g)(1)–(3). Those juveniles that are committed for a determinate period of time are eligible to receive time credits toward their determinate commitment. T.C.A. § 37–1–137(h)(1). Inherently, juveniles that are committed for an indefinite time are not eligible for such credits.

■ We conclude that a determinate commitment to the custody of DCS is not more severe than an indefinite commitment. Despite this holding, and in the event the Supreme Court disagrees with our determination, we will proceed to consider the defendant's other issues as if we had held the determinate commitment to be more severe than an indeterminate commitment.

### B.

■ The defendant argues that the trial court's imposition of a more severe sentence is a violation of his constitutional rights to due process, equal protection, and against double jeopardy. The defendant's contentions with respect to each of these constitutional arguments are not set forth with clear specificity in his brief. However, he generally asserts, in conclusory form, that his constitutional rights were violated because, in his judgment, the "sentence" of the juvenile court "affixe[d] the upper limit of the sentence which may be imposed following a *de novo* appeal." We disagree with this assertion and conclude that, even if the trial court's commitment is more severe, it is, nevertheless, constitutional.

■ Our starting point on this issue is the statute. T.C.A. § 37–1–159(a) provides that an appeal from the juvenile court's final judgment or order in a delinquency proceeding may be made to the criminal court or court having criminal jurisdiction. *Id.* On appeal, the criminal court or court having criminal jurisdiction "shall hear the testimony of witnesses and try the case de novo." *Id.* Subsections (b) and (c) of T.C.A. § 37–1–159 provide that

[a]n appeal does not suspend the order of the juvenile court, nor does it release the child from the custody of that court or of that person, institution or agency to whose care the child has been committed. Pending the [*de novo*] hearing, the criminal court or circuit court may make the same temporary disposition of the child as is vested in juvenile courts; provided, that until the criminal court or circuit court has entered an order for temporary disposition, the order of the juvenile court shall remain in effect.

When an appeal has been perfected, the juvenile court shall cause the entire record in the case, including the juvenile court's findings and written reports from probation officers, professional court employees or professional consultants, to be taken forthwith to the criminal court or circuit court whose duty it is, either in term or in vacation, to set the case for an early hearing.... [W]hen the decision appealed involves the deprivation of a child's liberty as the result of a finding that such child engaged in criminal activity, such hearing shall be held within forty-five (45) days of receipt of the findings and reports....

In conducting a *de novo* hearing, the criminal court is not charged with the responsibility of reviewing the propriety of the commitment imposed by the juvenile court; rather, it is to adjudicate the allegations against the defendant as if the hearing in the juvenile court had not occurred. The statute does not prohibit the trial court

542

from imposing a different, or even a more severe, commitment than that of the juvenile court. *See e.g., Mays,* 2000 WL 705979, at *3 (Without addressing the constitutional issues or the issue of whether a determinate commitment is more severe than an indefinite commitment, this Court affirmed the trial court's imposition of a determinate commitment following the juvenile court's imposition of an indefinite commitment).

We are aware of no authority discussing these constitutional issues in the context of the juvenile court system. However, certain well-established United States Supreme Court cases support our conclusion that a trial court's more severe commitment on *de novo* appeal does not violate the defendant's constitutional rights. The first case, *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), deals with the constitutionality of a harsher sentence upon reconviction in the *adult* criminal court system. The second case, *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), addresses the constitutionality of a harsher penalty in a two-tier *adult* criminal system. Although these Supreme Court cases do not involve the juvenile court system, the arguments made by the defendants there are analogous to the ones now before us.

In *Pearce,* the defendant was convicted of assault with the intent to commit rape. *Id.* at 713, 89 S.Ct. at 2074. The trial judge sentenced the defendant to a prison term of 12 to 15 years. *Id.* This original conviction and sentence were reversed in a post-conviction proceeding initiated by the defendant. *Id.* He was retried, convicted, and sentenced to a prison term, which, in effect, amounted to a longer sentence than the original sentence. *Id.* The defendant filed a habeas corpus petition, asserting that the longer sentence upon reconviction

was unconstitutional and void. *Id.* at 713–14, 89 S.Ct. at 2074.

The Supreme Court specifically held that the Double Jeopardy Clause and the Equal Protection Clause did not provide an absolute bar to a harsher sentence upon reconviction. *Id.* at 723, 89 S.Ct. at 2079. In discussing the double jeopardy issue, the Court stated that

[l]ong-established constitutional doctrine makes clear that, beyond the requirement [that the defendant receive a credit toward his second sentence for the time served following the first sentence], the guarantee against double jeopardy imposes no restrictions upon the length of a sentence imposed upon reconviction.

* * *

[I]t has been settled that a corollary of the power to retry a defendant is the power, upon the defendant's reconviction, to impose whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction.

* * *

Although the rationale for this "well-established part of our constitutional jurisprudence" has been variously verbalized, it rests ultimately upon the premise that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean.... The conviction *has* been set aside and the unexpired portion of the original sentence will never be served. A new trial may result in an acquittal. But if it does result in a conviction, we cannot say that the constitutional guarantee against double jeopardy of its own weight restricts the imposition of an otherwise lawful single punishment for the offense in question.

*Id.* at 719–21, 89 S.Ct. at 2077–78 (emphasis in original); *see also State v. Harris,* 919 S.W.2d 323, 328 (Tenn.1996) (citing *Pearce* ).

The defendant's equal protection argument in *Pearce* was premised upon the idea that, as opposed to defendants who do not seek new trials, defendants who seek to reverse their original convictions were adversely treated because they were the only defendants exposed to the risk of getting their sentence increased. *Id.* at 722, 89 S.Ct. at 2079. The Court rejected this argument, stating that the issue could not be dealt with rationally under the terms of equal protection. *Id.* As the Court explained,

> [a] man who is retried after his first conviction has been set aside may be acquitted. If convicted, he may receive a shorter sentence, he may receive the same sentence, or he may receive a longer sentence than the one originally imposed. The result may depend upon a particular combination of infinite variables peculiar to each individual trial. It simply cannot be said that a State has invidiously "classified" those who successfully seek new trials, any more than that the State has invidiously "classified" those prisoners whose convictions are *not* set aside by denying the members of that group the opportunity to be acquitted. To fit the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished.

*Id.* at 722–23, 89 S.Ct. at 2079 (emphasis in original). The *Pearce* case also addresses the impact of the Due Process Clause on the imposition of a harsher sentence upon retrial. *Id.* at 723–26, 89 S.Ct. at 2080. The Court noted that the concept of due process requires that the defendant not be punished for having successfully attacked his first conviction. *Id.* at 725, 89 S.Ct. at 2080. Because the fear of vindictiveness might deter a defendant from exercising the defendant's right to challenge the correctness of the first conviction, the Court held that due process of law requires that a defendant not experience such fear of retaliation by the sentencing judge. *Id.* To thwart such vindictiveness and the fear of such vindictiveness, the Court concluded that, when a sentencing judge imposed a harsher sentence upon reconviction, the "reasons for his doing so must affirmatively appear." *Id.* at 726, 89 S.Ct. at 2081; *see Britt v. State,* 2 Tenn.Crim.App. 581, 455 S.W.2d 625, 626–27 (1969) (discussing *Pearce* and finding that the trial judge's "expressed reasons" for imposing a greater punishment upon reconviction were valid and proper).

The *Colten* case takes our analysis a step closer by applying the *Pearce* case and its reasoning to Kentucky's two-tier system for adjudicating certain criminal offenses. 407 U.S. at 112, 92 S.Ct. at 1958. As analogous to the juvenile system in the instant case, under Kentucky's two-tier system, an individual charged with a misdemeanor could be tried and sentenced in an "inferior court," and if the defendant was dissatisfied with that court's sentence, the defendant had a right to a *de novo* appeal in the court of general criminal jurisdiction. *Id.* at 112–13, 92 S.Ct. at 1958. The defendant in *Colten* was charged with disorderly conduct, an offense which carried a maximum penalty of six months in jail and a fine of $500. *Id.* at 107–08, 92 S.Ct. at 1956. The lower court tried, convicted, and fined the defendant $10. *Id.* at 108, 92 S.Ct. at 1956. The defendant appealed, exercising his right to a *de novo* trial. *Id.* The second court convicted the defendant and imposed a fine of $50. *Id.* The defendant appealed the second conviction, arguing that the harsher fine violated the Double Jeopardy Clause and the Due Process Clause. *Id.* at 114,

92 S.Ct. at 1959. The defendant in *Colten* did not raise an equal protection argument. *Id.*

The Court rejected the defendant's double jeopardy argument by citing its previous holding in *Pearce*. *Id.* at 119, 92 S.Ct. at 1961. In rejecting the defendant's due process argument, the Court provided the following discussion and distinction of the *Pearce* case:

> Colten rightly reads *Pearce* to forbid, following a successful appeal and reconviction, the imposition of a greater punishment than was imposed after the first trial, absent specified findings that have not been made here.

> \* \* \*

> Our view of the Kentucky two-tier system of administering criminal justice, however, does not lead us to believe, and there is nothing in the record or presented in the briefs to show, that the hazard of being penalized for seeking a new trial, which underlay the holding in *Pearce*, also inheres in the *de novo* trial arrangement. Nor are we convinced that defendants convicted in Kentucky's inferior courts would be deterred from seeking a second trial out of fear of judicial vindictiveness. The possibility of vindictiveness, found to exist in *Pearce*, is not inherent in the Kentucky two-tier system.

> We note first the obvious: that the court which conducted Colten's trial and imposed the final sentence was not the court with whose work Colten was sufficiently dissatisfied to seek a different result on appeal; and it is not the court that is asked to do over what it thought it had already done correctly. Nor is the *de novo* court even asked to find error in another court's work. Rather, the Kentucky court in which Colten had the unrestricted right to have a new trial was merely asked to accord the same trial, under the same rules and procedures, available to defendants whose cases are begun in that court in the first instance.

> \* \* \*

> It may often be that the superior court will impose a punishment more severe than that received from the inferior court. But it no more follows that such a sentence is a vindictive penalty for seeking a superior court trial than that the inferior court imposed a lenient penalty. The trial *de novo* represents a completely fresh determination of guilt or innocence. It is not an appeal on the record.

*Id.* at 115–17, 92 S.Ct. at 1959–61; *see State v. Russell*, 10 S.W.3d 270, 277 (Tenn. Crim.App.1999) (citing and distinguishing *Pearce*); *see also Roberts v. State*, 212 Tenn. 25, 367 S.W.2d 480, 481 (1963) (holding that a defendant could receive a greater fine after he appealed a general sessions court judgment for a trial *de novo* in criminal court).

The defendant in the instant case appears to suggest that the *Pearce* and *Colten* holdings do not apply to this case because "the proverbial slate [was] *not* wiped clean" in that the defendant remained in the custody of DCS for some time following his appeal from the juvenile court's judgment. This argument completely misses the mark. According to our review of the record, the defendant spent approximately two weeks in DCS's custody following his appeal from the juvenile court's judgment. The juvenile court's order was filed on August 19, 2004. The defendant filed his notice of appeal on August 27, 2004. The defendant was released on bond following a hearing on September 10, 2004. This is clearly the process contemplated by T.C.A. § 37–1–159(b)

("Pending the [*de novo*] hearing, the [trial court] may make the same temporary disposition of the child as is vested in juvenile courts...."). Furthermore, this process and the possibility that a juvenile offender may remain in the custody of DCS during the pendency of the *de novo* appeal does not mean that the slate is not eventually wiped clean. The proverbial slate, as the defendant calls it, will still be wiped clean once the trial court makes its final judgment.

To somehow improve his double jeopardy argument, the defendant cites the case of *State v. Pennington,* 952 S.W.2d 420 (Tenn.1997), for the proposition that jeopardy attaches to a defendant's initial appearance before a judicial commissioner if the consequential detention of that appearance constitutes "punishment." He asserts that his "incarceration" pending his *de novo* appeal to the trial court was pure punishment, and therefore, the constitutional guarantee against double jeopardy was implicated. The *Pennington* case does not support the defendant's case or warrant further discussion. It is not a juvenile delinquency case, nor does it deal with a two-tier adjudicatory system or a *de novo* appeal. It does not involve analogous facts or issues. We are simply unable to fit the facts of the instant case within the rubric of the *Pennington* case and its analysis. A holding in a case must be construed in the context of the facts of that case. *National Life Accident Ins. Co. v. Eddings,* 188 Tenn. 512, 523, 221 S.W.2d 695, 699 (Tenn.1949).

## C.

■ The defendant also asserts that the "enhanced sentencing provisions" of the statutes governing juvenile court proceedings violate the United States Supreme Court's holding in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). In *Blakely,* the Supreme Court held that the Sixth Amendment right to a jury trial required that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory minimum must be submitted to a jury." *Id.* at 301, 124 S.Ct. at 2536 (citing *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)). The defendant states that, in the juvenile court system, an indefinite commitment to the custody of DCS is "preferred." He argues that, because additional findings are required for a determinate commitment, the holding in *Blakely* requires that those facts be submitted to a jury, rather than a judge. The *Blakely* case pertains to adult criminal sentencing schemes. The defendant has not provided any case authority for the extension of *Blakely* to the disposition and commitment of juvenile offenders. We reject his request for such an extension. Because the United States Supreme Court and the Tennessee Supreme Court have both held that a juvenile is not entitled to a jury trial on a *de novo* appeal, *Blakely* is simply not implicated by the facts of this case.

## VI.

## A.

■ The defendant next challenges several aspects of the jury instructions given by the trial court. A defendant has a right to a correct and complete charge of the law. *State v. Garrison,* 40 S.W.3d 426, 432 (Tenn.2000). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner,* 154 S.W.3d 48, 58 (Tenn.2005). The defendant first asserts that the trial court's aggravated rape instruction was error because it included the

*mens rea*[5] of "recklessly." He contends that "aggravated rape can be committed either intentionally or knowingly but certainly not recklessly." We disagree.

Aggravated rape is defined in T.C.A. § 39–13–502(a) (2003) as the

> unlawful penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
>
> (2) The defendant causes bodily injury to the victim;
>
> (3) The defendant is aided or abetted by one (1) or more other persons; and
>
> (A) Force or coercion is used to accomplish the act; or
>
> (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless.

The trial court's jury instruction as to the offense of aggravated rape read, in relevant part, as follows:

> Any person who commits the offense of aggravated rape is guilty of the crime. For you to find the [d]efendant guilty of this offense the State must have proven, beyond a reasonable doubt, the existence of the following essential elements: 1) That the [d]efendant had unlawful sexual penetration of the alleged victim, or the alleged victim had unlawful sexual penetration of the [d]efendant. And 2), that the [d]efendant was aided or abetted by one or more persons. And 3), no excuse me ... and the coercion, the force of coercion was used to accomplish the act or that the [d]efendant knew or

had reason to know that the alleged victim was physically helpless. And 3)[sic], that *the [d]efendant acted either intentionally, knowingly, or recklessly.*

* * *

> Intentionally and knowingly have been defined for you previously in these instructions. Recklessly means ... recklessly means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances, as viewed from the accused person's standpoint.

(Emphasis added).

T.C.A. § 39–11–301(c) (2003) states that "[i]f the definition of an offense within this title does not plainly dispense with a mental element, *intent, knowledge or recklessness* suffices to establish the culpable mental state." (Emphasis added). The statute defining the offense of aggravated rape does not express a required culpable mental state. Furthermore, the definition does not plainly state that no culpable mental state is required. Therefore, as is prescribed by T.C.A. § 39–11–301(c), the offense of aggravated rape may be committed with intent, knowledge, or recklessness. *Id.; State v. Bowles,* 52 S.W.3d 69, 75–76 (Tenn.2001); *State v. Hill,* 954 S.W.2d 725, 726 (Tenn.1997). Accordingly, we hold that it was not error for the trial court to include the *mens rea* of "recklessly" in its aggravated rape jury instruction.

---

**5.** The terms *"mens rea"* and *"culpable men-* tal state" are used interchangeably.

■ The defendant also contends that the trial court erroneously charged the *mens rea* element for aggravated rape by stating it in the disjunctive. He argues that the use of the word "or" in "acted either intentionally, knowingly, or recklessly" permitted the possibility of a non-unanimous verdict in violation of the Tennessee and United States Constitutions. The defendant cites *State v. Page*, 81 S.W.3d 781 (Tenn.Crim.App.2002), and *State v. Forbes*, 918 S.W.2d 431 (Tenn. Crim.App.1995), to support this contention. However, neither case stands for the proposition that the use of the word "or" in listing alternative culpable mental states impinges on a defendant's constitutional right to a unanimous verdict.

The defendant in *Page*, a juvenile, was convicted of second degree murder. 81 S.W.3d at 782. The issue on appeal was whether the trial court erred in instructing the jury on the "knowing" *mens rea* element of second degree murder. *Id.* The trial court instructed the jury that the "knowing" element could be established by the defendant's awareness "(1) that his conduct is of a particular nature; *or* (2) that a particular circumstance exists; *or* (3) that the conduct was reasonably certain to cause the result." *Id.* (emphasis in original). Second degree murder, however, "is strictly a result-of-conduct offense"; thus, to be convicted of second degree murder, "a defendant must be aware that his or her conduct is reasonably certain to cause death." *Id.* at 788. The Court of Criminal Appeals reversed and remanded this case because the disjunctive form of the "knowing" instruction allowed the jury to convict the defendant for second degree murder based only upon a finding that the defendant was aware of (1) the nature of his conduct or (2) the circumstances surrounding his conduct. *Id.* In other words, the trial court's jury instruction was erroneous because the use of the word "or"

made it seem as though the jury did not have to find that the defendant was aware that his conduct was reasonably certain to cause death. *See Id.*

In *Forbes*, the defendant was convicted of fabricating evidence and aggravated perjury. 918 S.W.2d at 435. The statute provided that the offense of fabricating evidence could be established by the "making, presenting, or using" of evidence known to be false. *Id.* at 446–47. The criminal indictment charged the defendant with "making *and* presenting" the fabricated evidence. *Id.* at 445. The trial court's jury instruction, on the other hand, charged that the offense was complete if the defendant "made *or* presented" the fabricated evidence. *Id.* Thus, "[t]he indictment would have required a finding of both to convict, yet the charge permitted a finding of one or the other." *Id.* at 447. After considering the disparity between the indictment and the jury instruction, and after finding that the trial court did not take precautions to preserve unanimity, the Court of Criminal Appeals reversed, stating that there was a strong possibility of a composite jury verdict in violation the defendant's right to a unanimous jury verdict. *Id.*

■ "Generally, alternative theories, *mental states*, modes of committing the crime, or means by which the crime was committed may be submitted to the jury without the necessity of precautions to assure jury unanimity." *State v. Young*, No. 01C01–9605–CC–00208, 1998 WL 258466, at *5 n. 4 (Tenn.Crim.App. M.S., filed May 22, 1998) (emphasis added). Our research reveals, and the defendant has cited, no authority which would persuade us to conclude that the use of the word "or" in listing the alternative culpable mental states for the offense of aggravated rape violates state and federal constitutional

protections against the possibility of non-unanimous jury verdicts.

### B.

■ The defendant also argues that the trial court's kidnapping jury instruction was error because it included an improper definition of the *mens rea* of "knowingly." Kidnapping is defined in T.C.A. § 39–13–303(a) (2003) as follows:

(a) Kidnapping is false imprisonment as defined in § 39–13–302:

(1) Under circumstances exposing the other person to substantial risk of bodily injury; or

(2) Where the confinement of another is in a condition of involuntary servitude.

False imprisonment, as defined in T.C.A. § 39–13–302(a) (2003), provides that "[a] person commits the offense of false imprisonment who *knowingly* removes or confines another unlawfully so as to interfere substantially with the other's liberty." (Emphasis added). The trial court's instruction as to the kidnapping offense read, in relevant part, as follows:

Any person who commits the offense of kidnapping is guilty of a crime. If you find the [d]efendant guilty of this offense the State must have proven, beyond a reasonable doubt, the existence of the following essential elements: 1) That the [d]efendant removed or confined another . . . another person unlawfully so as to interfere substantially with the other's liberty. And 2), that the removal or confinement was under circumstances that exposed the other to substantial risk of bodily injury. And, 3), that the [d]efendant acted knowingly. . . . "Knowingly" means a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. *A person acts knowingly with*

*respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.*

(Emphasis added). The defendant argues that kidnapping is not a "result-of-conduct" offense, and, therefore, the definition of "knowingly" used in the kidnapping charge should not have included the sentence stating that "[a] person acts knowingly with respect to a *result* of the person's conduct when the person is aware that the conduct is reasonably certain to cause the *result*." (Emphasis added). Again, we disagree with the defendant.

The defendant again relies on the *Page* case in support of his argument. In *Page*, the Court of Criminal Appeals discussed how the culpable mental states of intentional, knowing, and reckless are defined with reference to either (1) the nature of the defendant's conduct, (2) the circumstances surrounding the defendant's conduct, and (3) the result of the defendant's conduct. 81 S.W.3d at 787. The Court stated that

"Intentional" can refer to the nature of defendant's conduct or the result of defendant's conduct. [T.C.A.] § 39–11–302(a). "Knowing" can refer to all three of the conduct elements. *Id.* at (b). "Reckless" can refer to the circumstances surrounding defendant's conduct or the result of defendant's conduct. *Id.* at (c).

*Id.* The "knowing" definition at issue in *Page* was virtually identical to the definition of "knowingly" in this case. *Id.* However, the *Page* case is distinguishable because the "knowing" definition at issue in that case was given as a part of an instruction on the offense of second degree murder. *Id.* The Court held that second degree murder was "strictly a result-of-conduct offense." *Id.* at 788. Therefore, as previously mentioned in this opinion,

the Court found the definition of "knowing" to be error in that the trial court's definition, which was in the disjunctive form, lowered the State's burden of proof by allowing the jury to convict the defendant for second degree murder without a finding that he was aware that his conduct was reasonably certain to cause death. *Id.* The instant case is not a second degree murder case. We simply cannot read the *Page* case to support the defendant's proposition that kidnapping is *not* a "result-of-conduct" offense, or that the definition of "knowingly" in a kidnapping jury instruction cannot include the "result-of-conduct" component.

The trial court advised the jury of the express terms of the statutes that define the offense of kidnapping. One of the terms was "knowingly." The trial court's charge on the definition of "knowingly" is taken almost verbatim from the Tennessee Pattern Jury Instruction for the offense of kidnapping. *See* T.P.I.-Crim. 8.01. The defendant has failed to cite any authority that would lead us to conclude that this definition is erroneous.

The defendant also argues that the disjunctive form of the definition of "knowingly" violated his right to a unanimous jury verdict. Again, the defendant fails to cite any authority, and we have found none, supporting the argument that the trial court's use of the word "or" in this context is unconstitutional. This issue is also found adverse to the defendant.

## VII.

The trial court's order awarding temporary custody of the defendant to the custody of DCS for a determinate period of time is affirmed. This case is remanded to the trial court for enforcement of the trial court's judgment and for the collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Daniel Allyn Hood.