# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 22, 2015

## STATE OF TENNESSEE v. MAXWELL MONROE HODGE

**Appeal from the Criminal Court for Sullivan County**
**No. S61208      Robert H. Montgomery, Jr., Judge**

**No. E2014-01059-CCA-R3-CD - Filed March 26, 2015**

Convicted of rape by a Sullivan County Criminal Court jury, the defendant, Maxwell Monroe Hodge, appeals and claims that the evidence is insufficient to support his conviction and that the definition of "sexual penetration" expressed in Tennessee Code Annotated section 39-13-501(7) is impermissibly vague relative to that subsection's use of the terms "genital or anal openings." Discerning no error, we affirm the judgment of the criminal court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Jonathan E. Roberts, Bristol, Tennessee, for the appellant, Maxwell Monroe Hodge.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Barry Staubus, District Attorney General; and Teresa Nelson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted of Class B felony rape pursuant to Tennessee Code Annotated section 39-13-503 and was sentenced as a persistent offender to a term of 25 years in the Department of Correction. Following the overruling of his timely motion for new trial, the defendant filed a timely notice of appeal.

At trial, the 22-year-old female victim testified that the defendant was married to the victim's cousin, Nicole Smith Hodge. The victim went to the defendant's and Ms. Hodge's home in Bluff City on March 30, 2012, to celebrate the birthdays of the victim and of Ms. Hodge. The victim testified that the defendant was there that evening but was "in and

out" and "always had a beer in his hand." Because she had been drinking, the victim planned to stay the night on the sofa at the defendant's and Ms. Hodge's residence.

The victim testified that the defendant and Ms. Hodge began arguing. The defendant left the residence but later called Ms. Hodge to tell her that his motorcycle had broken down. Ms. Hodge woke the victim to tell her that Ms. Hodge was going to pick up the defendant. The victim went back to sleep on the sofa, only to be awakened later by feeling the defendant's hand on her vagina. She testified that "it felt like he was trying to pry me open." When asked on direct examination whether she felt the defendant's fingers "manipulating or touching [her] vaginal area," the victim replied, "I felt the pressure. That's what woke me up."

The victim testified that she "scooted back" and "kicked him in the chest all in the same motion and he stumbled back, fell on his butt for a second and then stood up." She asked the defendant, who "was drunk," what he was doing, and he mumbled something that was "hard to comprehend." The defendant walked away. The victim said that she ran first to the "kids' room" but then went to Ms. Hodge and told her what had happened. Ms. Hodge told her to go home and "call the law." The victim went to her father's house in Bristol and, from there, "called the law."

In response to the call, an officer came and spoke with her and told her that a detective would be in touch with her. Before the detective contacted her, the victim obtained an order of protection to prevent the defendant's contacting her.

On cross-examination, the victim agreed that she had been drinking in the evening before the assault occurred. When asked whether she felt pressure or penetration, the victim testified, "Pressure, penetration in my mind is the same thing." When asked if she knew whether he had "actually penetrated [her] vagina," the victim replied, "I felt violated and penetrated, yes, sir."

She said the assault occurred after midnight but before three a.m. when she arrived at her father's home. She testified that she called the police around three a.m. but agreed that she had testified in the preliminary hearing that she called around four or five a.m.

The victim testified that, when the defendant assaulted her, she was wearing a tee shirt and baggy shorts. She agreed that, after the defendant was arrested, she stayed with Ms. Hodge "for a couple of days on her couch because [she] didn't have no where else to go."

Nicole Hodge testified about the victim's visit in March 2012 to Ms. Hodge's home. The defendant, who had been drinking, argued with Ms. Hodge and left on his motorcycle. Later, the defendant called Ms. Hodge and asked her to pick him up because he had "run out of gas." Ms. Hodge said she asked the victim to "watch over the kids" while Ms. Hodge went to retrieve the defendant. The victim was in the living room on the sofa. A young daughter of Ms. Hodge's was also in the living room. When Ms. Hodge returned with the defendant, the victim and the young daughter were still in the living room, and Ms. Hodge retired to her bedroom. The defendant did not lie down with her in the bedroom.

Ms. Hodge testified that she was "half and half" asleep – "really not asleep because [the defendant] was ranting and raving, rambling." Then, she said, the defendant came into the bedroom and said that "the whore needed to leave the house because she was claiming that he had tried to touch her vagina." Ms. Hodge said that the defendant told her this and left; then, the victim came into the bedroom "distraught, like totally just lost it hysterically . . . [c]rying, upset." The victim told Ms. Hodge that the defendant tried "to finger her I guess you would say." Ms. Hodge said that the victim said the defendant was trying to "open up her vagina." Ms. Hodge told the victim to go to her father's home and "do what she needs to do."

The victim left, and Ms. Hodge called the victim's father to ask him to be awake and awaiting the victim's arrival, but during the call from her bedroom, the "phone went dead." She then went to the living room and discovered the telephone wires "were cut, split, ripped." She spliced the wires and was able to again call the victim's father, but during this call, the telephone "went dead again." She went outside the next day and discovered that a telephone wire had been removed from its connection.

On cross-examination, Ms. Hodge testified that she was still married to the defendant. She testified that, during the victim's visit, she and the victim drank some alcohol but not very much, that they were "not big drinkers." They had used no drugs. Ms. Hodge agreed that the defendant had not been flirting with the victim and had shown no interest in her. She also agreed that she had previously been convicted of stealing a box of diapers from a Dollar Store.

The victim's father testified that the victim came to his home on March 31, 2012, between two a.m. and three a.m. "She was crying and throwing a fit, just plumb out of her head," but at the time she would not tell her father what was wrong. He said that, later, an officer came to the home in response to the victim's call. The victim's father acknowledged that earlier he had received two calls from Ms. Hodge but that, both times, the "phone went dead."

Sullivan County Sheriff's Officer Jeret Ratliff testified that he was dispatched to the home of the victim's father in the early hours of March 31, 2012, where he spoke with the "crying and very upset" victim. Officer Ratliff said that his job was to get a "baseline statement that we turn over to the detectives." He said he had difficulty getting a statement from the victim because "she was so upset." The victim declined medical attention. Officer Ratliff then went to the defendant's residence. The defendant, who had been drinking, told the officer that "he reached his hand down to get up off of the couch and he pushed down on her thigh." Officer Ratliff said he turned his report over to the detectives.

Sullivan County Sheriff's Department Detective Cindy Adams testified that she received Officer Ratliff's report on April 2, 2012, and met with the victim on April 4. She said that the victim "broke down and started crying extremely hard." Detective Adams ultimately took a statement from the victim and then interviewed the defendant on April 9. The defendant furnished the detective with a signed statement. The detective testified that, in the statement, the defendant said that, when he returned from running out of gas, he was drunk and sat in the living room floor at the end of the couch to watch television. He told his stepdaughter to go to bed, and she did so. The statement then said:

> I got up not long after she left and got a kick in the left side of my head and [the victim] started hollering and after that the only thing I remember was waking up in the bed with the police officer standing at the foot of the bed.

Detective Adams testified that the victim was not examined by medical personnel following the assault because the victim declined to go to the hospital.

In his defense, the defendant testified that, earlier in the evening of March 30, 2012, he and his wife, the victim's cousin, argued about who would pick up his brother-in-law. Trying "to get away from it," the defendant left on his motorcycle but ran out of gas. He called his wife, and she picked him up sometime near midnight and took him home. The defendant's wife went to bed. The defendant testified that everyone had been drinking that night. The defendant said he went to the living room to watch television and sat in the floor between the couch and a chair. He told his daughter, who was sleeping in the chair, to go to bed, which she did. When he started to get up from the floor, he felt something hit him hard "in the left side of the face." He said he remembered nothing else until the officer awakened him around 4:00 to 4:30 a.m.

The defendant characterized the victim's claims as "false accusations." He denied touching the victim.

On cross-examination, the defendant admitted having prior convictions of grand larceny, theft, burglary, felony reckless endangerment, evading arrest, and felony failure to appear in court. On redirect examination, he testified that most of his convictions occurred in 1997 or 1998. He said that his wife's problem with the telephone on the night in question was that the battery lost its electric charge.

The jury returned a verdict of guilty of rape, a Class B felony. *See* T.C.A. § 39-13-503. The trial court sentenced the defendant, a persistent offender, to serve a term of 25 years in the Department of Correction. The trial court denied the defendant's timely motion for new trial, and the defendant filed a timely notice of appeal.

In his first issue, the defendant challenges the sufficiency of the convicting evidence. He asserts that the State failed to prove that the defendant penetrated the victim and that, in any event, the State failed to prove the requisite mens rea for any touching of the victim's vagina.

When an accused challenges the sufficiency of the evidence, the appellate court considers the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), regardless whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence, *State v. Winters*, 137 S.W.3d 641, 654-55 (Tenn. Crim. App. 2003). Especially inimical to the defendant's claim is the well-rooted axiom that the appellate court neither re-weighs the evidence nor substitutes its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Also, the credibility of the witnesses, the weight and value of the evidence, and all other factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The appellate court affords the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As alleged in the charging instrument and as found by the jury,

> "[r]ape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances: . . The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent."

T.C.A. § 39-13-503(a)(2). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

In the present case, the victim testified that she was awakened by feeling the defendant's hand on her vagina and that "it felt like he was trying to pry [her] open." When asked on direct examination whether she felt the defendant's fingers "manipulating or touching [her] vaginal area," the victim replied, "I felt the pressure. That's what woke me up." On cross-examination, the victim testified, "Pressure, penetration in my mind is the same thing." When asked if she knew whether he had "actually penetrated [her] vagina," the victim replied, "I felt violated and penetrated, yes, sir."

"The occurrence of penetration, even though penetration is statutorily defined, is a question of fact. Thus, if the evidence is such that any rational trier of fact could have found penetration beyond a reasonable doubt, the evidence must be deemed sufficient." *State v. Bowles,* 52 S.W.3d 69, 74 (Tenn. 2001). "[T]he testimony of a victim, by itself, is sufficient to support a conviction." *State v. Nance*, 393 S.W.3d 212, 231 (Tenn. Crim. App. 2012) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). The State need not present "physical" evidence of penetration to establish the crime of rape. *See generally State v. Tommie Phillips*, No. W2012-01126-CCA-R3-CD (Tenn. Crim. App., Jackson, Dec. 13, 2013). Penetration may be established by circumstantial evidence. *See generally State v. Edward William Crandall*, No. E2012-00338-CCA-R3-CD (Tenn. Crim. App., Knoxville, March 21, 2013).

Our supreme court has recognized that:

> "[t]here is ... 'sexual penetration' in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient."

*Bowles*, 52 S.W.3d at 74 (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)).

We have deferred to a jury's finding of penetration and affirmed a rape conviction when the female victim testified: "'He put his hand on my private and then he put his private on mine, and it went in a little bit, and white stuff came out and it got on me, and I wiped it off.'" *State v. Gibson,* 973 S.W.2d 231, 236 (Tenn. Crim. App. 1997). Likewise,

-6-

we deferred to the jury's finding of penetration when a victim testified that the accused had "'push[ed her] panties inside" her. *State v. Joshua Brandon Tate*, No. M2011-02128-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Nashville, July 31, 2013). We affirmed a rape conviction based upon proof that the accused contacted "'the outer labia of the female genitalia." In *State v. James R. Troxell*, No. E2012-00233-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Knoxville, Aug. 27, 2012), we determined that sufficient evidence of penetration existed when the "victim testified that the defendant placed his fingers on her vagina and rubbed her vaginal area." We upheld a verdict of anal rape when the victim had testified that the accused "'tried to put his wiener in [her] butt,'" that the accused's penis did not "'enter [her] body,'" that she could tell that the accused was trying to penetrate her anus with his penis "'[b]ecause [she] felt him . . . [o]n [her] butt,'" and that the action was "'[u]ncomfortable.'" *State v Albert L. Schlief*, No. E2008-02147-CCA-R3-CD, slip op. at 15-16 (Tenn. Crim. App., Knoxville, March 15, 2010).

Given our courts' interpretation of the term "penetration" and the quantum of proof required to present a question for the trier of fact, we conclude that the State established the element of penetration in the present case. Plainly, per the case law, the victim's description of a feeling that the defendant was trying to "pry her open" alone supports a finding of penetration.

Next, the defendant asserts that the evidence is insufficient because the State did not establish the mens rea required to convict him of rape.

The State may establish the offense of rape by showing that the accused acted intentionally, knowingly, or recklessly. *See* T.C.A. § 39-11-301(c) (2003) (stating that "[i]f the definition of an offense within this title does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state"); *State v. Hood*, 221 S.W.3d 531, 546 (Tenn. Ct. App. 2006) (holding that, because the statute defining the offense of aggravated rape does not express a required culpable mental state and does not plainly state that no culpable mental state is required, pursuant to Tennessee Code Annotated section 39-11-301(c), "the offense of aggravated rape may be committed with intent, knowledge, or recklessness"). Although the defendant may posit that his contact with the victim was at most negligent, the evidence in the light most favorable to the State cogently established that his penetration of the victim was at least knowing. As such, the State met its burden to show the defendant's culpability for this act.

In his remaining issue, the defendant maintains that the term "genital opening" contained in the statutory definition of "sexual penetration" is "unduly vague." *See* T.C.A. § 39-13-501(7) ("'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any

object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required . . . .").

The defendant's claim of vagueness, however, is unsupported by any citation to authority; conspicuously absent is any reference to the legal underpinning for a void-for-vagueness claim. Furthermore, the defendant does not favor the court with any citation to authority that the definition found in Code section 39-13-501(7) is analogous to any other statutory definition that has been declared vague, nor does he offer authority to show the effect of judicial interpretation of the definition in question.

"Issues which are not supported by argument, citation to authorities, or appropriate references to the record *will be treated as waived* in this court." Tenn. Ct. Crim. App. R. 10(b) (emphasis added). Based upon the Rule 10(b) imperative, we do not review any merits of the issue.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE