# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 20, 2012 Session

## STATE OF TENNESSEE v. ROBERT ALLEN ZALOBA

**Appeal from the Circuit Court for Williamson County**
**No. I-CR011593      Jeffrey S. Bivins, Judge**

---

**No. M2011-00855-CCA-R3-CD - Filed December 26, 2012**

---

A Williamson County Grand Jury indicted appellant, Robert Allen Zaloba, for eight counts of rape of a child, one count of rape, and one count of aggravated sexual battery. The first five counts of rape of a child (counts 1-5) pertained to one victim, and the remaining three counts of rape of a child, one count of rape, and one count of aggravated sexual battery involved a second victim. The trial court severed counts six through ten for trial.[1] The jury returned verdicts of guilty on all counts, for which the trial court sentenced appellant to serve an effective forty-eight-year sentence. Appellant raises the following issues: (1) whether the trial court properly admitted a reference that appellant had engaged in sexual relations with another individual; (2) whether the trial court properly denied appellant's request to admit the victim's prior inconsistent statement as substantive evidence; (3) whether the trial court properly denied appellant's request for a jury instruction that it could consider the victim's prior inconsistent statement as substantive evidence; (4) whether the trial court properly instructed the jury that "recklessly" was a proper mens rea for rape of a child; (5) whether the trial court properly instructed the jury by using the disjunctive "or" to connect the requisite mental states; (6) whether the trial court erred in rejecting appellant's mitigation proof at sentencing; (7) whether the trial court erred in imposing consecutive sentences; (8) whether the evidence is sufficient to sustain appellant's convictions; and (9) whether the circumstantial nature of the case rendered any errors by the trial court not harmless. Discerning no reversible error in the proceedings, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

---

[1]    The instant appeal involves the trial of severed counts six through ten of the indictment.

Kimberly S. Hodde, Peter J. Strianse, and David L. Raybin, Nashville, Tennessee, for the appellant, Robert Allen Zaloba.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Kim R. Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I.  Procedural History

Prior to trial, the parties in this case agreed that the trial court should sever counts one through five from counts six through ten of the indictment because the counts involved two different victims, brothers V.Z. and A.Z.[2]  Following hearings on multiple pre-trial motions, many of which are detailed below, jury selection in the trial of the counts involving victim V.Z. began on June 7, 2010.[3]  After hearing the evidence, closing arguments, and jury instructions, the jury deliberated and returned verdicts of guilty on all counts.

The trial court conducted a sentencing hearing and imposed sentences of twenty years for each of the three counts of rape of a child.  The court ordered the sentences for counts one and two to run concurrently with each other and the sentence for count three to run consecutively to the first two counts.  The trial court imposed sentences of eight years for count four, rape, and count five, aggravated sexual battery, to run concurrently with each other but consecutively to the sentences for counts one/two and count three.  Appellant's effective sentence was forty-eight years.  The trial court denied appellant's motion for new trial, and this appeal follows.

II.  Facts

The presentation of testimony began on June 8, 2011.  The State's first witness was the victim, V.Z.  At the time of trial, he testified that he was twenty years old and that he had completed one year of college at the University of Tennessee.  He was enjoying an internship

---

[2] Consistent with this court's policy to avoid the use of proper names for child victims of sexual crimes, we refer to the victims by their initials only.

[3] Counts six through ten involving V.Z. were re-numbered as counts one through five for trial purposes.

opportunity at the time, traveling around the country with popular political speakers and authors. He planned to attend Middle Tennessee State University the following fall.

The victim was born in the Ukraine. When his mother died, he and his siblings lived with their grandfather. When they reached school-age, they were placed in an orphanage across from a school because their grandfather's house was too far away from a school to allow them to attend. The victim learned from a member of the orphanage staff that an American was interested in adopting him and his siblings. The victim was excited about the prospect of being adopted by Americans. He was thankful that someone would rescue them from an orphanage and take them to America. When he first met appellant, the victim thought he was a nice man. Appellant's family adopted the then ten-year-old victim and his siblings and brought them to America on August 5, 2000.

When the victim first came to live with appellant's family, he spoke very little English. Appellant hired an "English as a Second Language" ("ESL") teacher to tutor the victim at home for a semester. The teacher would home-school the victim from approximately 8:00 a.m. until noon. The victim would spend the afternoon working on homework. During the period when the ESL teacher worked with the victim, appellant instructed him to speak only English with his siblings while in the household because when they spoke Ukrainian, appellant and his family could not understand. Appellant stated that if they spoke Ukrainian, they would be in trouble.

One afternoon in September 2000, a month after the victim arrived in the United States, appellant asked the victim to follow him downstairs to his office. While they were standing, he asked the victim to pull down his pants. Appellant pointed out to the victim that he was not circumcised and explained to the victim that he would need to pull the foreskin of his penis back to clean it properly. Appellant then removed his pants to show the victim the difference between a circumcised and an uncircumcised penis and to demonstrate the proper way to clean himself. Appellant told the victim that most Americans were different from him because most were circumcised. At that time, appellant took the victim's penis in his hand and began "sort of jerking it." Appellant suggested that they move to the couch. Appellant continued fondling the victim's penis, trying to make him ejaculate. Appellant told the victim that older boys liked to masturbate and that it should feel good to him. When the victim's body did not respond as appellant wanted, appellant gave up, reclined backward over an ottoman and chair, and positioned himself with his legs spread. Appellant instructed the victim to masturbate him, and the victim complied. The victim testified that appellant said something about "something shooting out and looking cool." Although the victim spoke very little English, he understood basic words and motions, sort of an informal sign language. He also understood the words "cool" and "awesome" that appellant used. Appellant told the victim not to tell anyone about what had happened in the office.

-3-

The victim told the jury that most of the abuse followed appellant's spanking him. Appellant would spank the victim "for just about anything." Appellant required the victim to completely remove his clothing to receive the punishments. The victim scratched a compact disc ("CD"), and appellant spanked him. One day, the family was together in their vehicle. One of appellant's children asked appellant's wife to turn the air conditioner up. When she declined, the victim commented that she probably did not know how. Appellant perceived the victim's comment as disrespectful and spanked the victim. Appellant would administer spankings of twenty to thirty lashes with a black, braided belt; on rare occasions, he would use a metal ruler. On some occasions, appellant would strike the victim up to fifty times. The whippings left welts. When the victim scratched appellant's car, appellant became so angry that he whipped the victim with the buckle of the belt, causing him to bleed. Although the victim once showed the welts to one of appellant's children, he never spoke to anyone about the spankings because he did not want to talk about what followed.

The second instance of sexual abuse occurred during a spanking. After appellant administered several lashes to the victim, appellant paused the spanking and gave the victim the choice of receiving more lashes or participating in sexual acts with him. The victim testified that during this instance of abuse, appellant told the victim that it would feel better if victim used his mouth. Appellant demonstrated the act on the victim. When the victim did not ejaculate, appellant reclined on the same chair and ottoman with his legs spread and told the victim to use his mouth on appellant's penis. When appellant ejaculated in the victim's mouth, the victim was stunned. Appellant showed him a box of Kleenex, from which the victim removed a tissue and spat the semen into it. The victim testified that it felt and tasted "gross." The victim never told anyone about the abuse because he was "ashamed and deeply embarrassed that he was willing to do these acts," and although he did so to stop the pain of the beatings, he "was embarrassed he gave in to the pain." The next time appellant took the victim downstairs, the victim asked appellant to warn him before ejaculating into his mouth. Appellant did so, and the victim removed appellant's penis from his mouth in time for appellant to ejaculate onto the ottoman and carpet.

The victim testified that the sexual abuse by appellant began in September 2000 and continued through early January 2004. One or two afternoons a week, appellant would take the victim downstairs to his office. After the spankings, appellant would refer to the subsequent abuse as "playing with his penis." This became routine for the victim. In the middle of a spanking, appellant would pause and recline against the chair and ottoman. The victim knew that he would either have to perform oral sex on appellant or continue to be spanked. He continued to participate because he did not want to be whipped further. The victim testified that in retrospect, he was disgusted that appellant would promise him all of the wonderful things of America and then use him for appellant's own pleasure.

-4-

Appellant's weight and girth were issues at trial. The victim explained in detail how appellant accomplished the sexual acts with him. The victim explained that appellant would sit on an ottoman with the backs of his knees pressed against it. He would recline backward onto the ottoman and the chair behind it and spread his legs. At the request of the State, the victim described how appellant looked unclothed. The victim told the jury that appellant was a very large man, and his stomach ended about six inches below his waistline. Appellant had another pouch of fat below that. From below the "lower fat pouch," appellant's penis extended about three to four inches. During oral sex, the victim would have approximately two inches of appellant's penis in his mouth and was able to put his hand between his mouth and the bottom of the fat pouch.

The victim testified that one day, appellant's oldest son noticed a semen stain on the ottoman and asked what it was. Appellant told him that he spilled coffee while he was spanking the victim. Appellant forced the victim to clean the spot with a wet tissue. Appellant told the victim that if his wife should ask about the stain, the victim was to tell her that appellant spilled coffee there.

The ESL teacher home-schooled the victim during the fall of 2000. He entered public school in January 2001. The victim testified about some difficulties he had during his years in middle school and high school. Appellant's oldest son introduced the victim to computer pornography while the victim was in middle school. When the oldest son went to college, he left the victim a DVD containing pornographic images. The victim printed three of the pictures and took them to school "for bragging rights." When he was caught by school officials, he received in-school suspension as punishment. When appellant's oldest son returned home from college on a break, he shared a website with the victim so that he could access pornography on the computer by himself. The victim did not think that appellant knew about the pornography until the victim had moved out of the house. The victim also received in-school suspension for his participation in a fight. He stated that the aggressor was calling him names like "Ukrainian b***h" repeatedly until he lost his temper.

The victim and appellant's family lived on Green Hills Drive from August 5, 2000, until June 2003. They moved into apartments at Alara Farms while contractors were completing construction of their new house. The family rented three apartments to accommodate the large family and to provide office space for appellant. While living in an apartment, the victim and his brother were involved in a fight, resulting in the victim being punished. Appellant called the victim into his office apartment, where appellant spanked the victim then had the victim perform oral sex on him on the bed in the spare bedroom. The victim tore his ACL shortly after that. The spankings and the sexual abuse stopped for a time while he healed.

The new home on Mitchell Place was completed in December 2003, at which time the family moved. Appellant's abuse of the victim continued until they moved into the house on Mitchell Place. Sometime in January 2004, on the third occasion that appellant requested the victim to accompany him downstairs at the new house, the victim refused to perform oral sex. He told appellant that he was no longer going to do the things appellant had him do in the past. As the victim began putting his clothes on and walking out, appellant was begging and pleading for him to come back to the room. As the victim left the room, appellant told him he would be sorry if he left the room.

The victim testified that during one episode of abuse, appellant "kind of sat there apologetically and was apologizing for having me do this" and explained that he had to have the victim perform oral sex because his wife would no longer have intercourse with him after their youngest son was born.

The victim testified that at the new house, everyone had his or her own room and own computer. The victim's computer use was an issue for appellant. The victim wanted to play video games all day on Saturday and after school. Appellant wanted everyone to spend "family time" together, attending a movie or going shopping, so appellant would disconnect the victim's access to the internet. The victim testified that "family time" was not as fulfilling or entertaining as playing video games. Appellant wanted to go out to "show off" the family, but the victim was embarrassed by appellant's weight. He overheard some of his teammates at a football game commenting on the size of a person they saw in the stands. The victim did not even have to look to know they were talking about appellant.

The victim liked to play "Call of Duty," an on-line World War II re-enactment game. Appellant's oldest son had introduced him to the game. He also enjoyed "World of Warcraft," a role-playing, imaginary game played against several on-line "gamers." One Thanksgiving day, everyone had retired to their own room. Appellant asked his son to disconnect the victim's internet access. The victim became angry because appellant was singling him out. In retaliation, he played his music very loudly. Appellant then had his son turn off the electricity to that part of the house. The victim removed a decorating book printed by appellant's publishing company from a shelf and burned it in the bathroom over a toilet. He stated that he burned the book to have light to read by because it was after dark when appellant disconnected his electricity and that he was not trying to burn down the house.

During the summer of 2005, appellant told the victim that he needed to spend more time outside and less time playing video games. The victim refused, and appellant grabbed him by the neck. The victim pushed appellant away and walked out of the room. He did not think that he hurt appellant but did not remain in the house to be sure. He left the house and

walked to Best Buy, a distance that took him approximately two hours to walk. He did not have a cellular telephone, so when he arrived at Best Buy, he called appellant to come get him. Appellant told him that he walked there, he could walk back. The victim instead telephoned his sister, who picked him up and drove him home.

In December 2005, appellant and his wife presented the victim with a "contract" regulating his internet usage. He recalled that he could not use the computer on holidays and that anytime he cursed, he would lose a day of internet use. The State asked the victim, "In December of 2005, after that agreement, did you overhear a comment that lead [sic] you to believe that [appellant] might be engaged in sexual contact with someone other than yourself?" The victim responded, "Yes, ma'am." The prosecutor continued, "Based on that comment, did you get angry again about the abuse?" The victim again replied, "Yes, ma'am." The victim testified that he confronted appellant the following day. Subsequently, he was involved in an altercation with appellant's wife.

On the evening of December 12, 2005, the family had finished dinner and retired to their own rooms. Appellant's wife called over the intercom and asked each of them to return to the kitchen for dessert. The victim complied. After remaining in the kitchen for approximately five minutes, during which time no other family member returned to the kitchen, the victim attempted to leave the room and return to his bedroom. Appellant's wife became angry and stood in front of the doorway. The victim pushed her out of the way and continued upstairs. She tripped and fell. From his room, the victim heard appellant's wife on the telephone with the police. He became angry and punched a hole in the wall.

A female officer arrived and took the victim to juvenile detention. As they were driving, he asked her how he could become emancipated. The officer asked why he would want to do that. The victim told her that appellant had been sexually abusing him. He was very angry that he had been misused and abused by appellant for four years and was then being sent to jail. Appellant's wife did not appear in juvenile court to prosecute the charges arising from the incident. The victim did not return to appellant's home after the incident on December 12, 2005.

The victim testified that looking back, he had mixed feelings about coming to America. He was thankful to have been adopted and thought he was in a better place than he would have been had he remained in the orphanage, but at the same time, he was disgusted that a man who promised to give him an opportunity used him for his own pleasure.

On cross-examination, the victim agreed that the water supply in the Ukraine was somewhat limited and that personal hygiene was an issue. Counsel questioned the victim

regarding whether his adoption physical included instructions from the physician about caring for himself properly and whether appellant was present during the examination.

Counsel also questioned the victim regarding the intercom system in the house. According to the victim, appellant and his wife could use the intercom to summon the children, but they were prohibited from responding back via the intercom. Counsel alluded to the feature of the intercom that allowed someone to listen in to another room, but the victim did not conclusively confirm whether he had used that feature.

Bill Holbrook testified that he purchased appellant's house on Green Hills Drive. In early January 2006, police officers called him and asked about the carpet. On officers' first visit to his home, they asked to look around and explained the reason they were asking. They also took photographs. Officers asked Mr. Holbrook if they could return the following day with a "light machine." The next day, officers drew the curtains, turned off all of the lights, and turned on the machine. They subsequently requested permission to remove two sections of carpet from the office. Mr. Holbrook stated that the machine "lit up pretty good" on those two pieces of carpet.

Lieutenant David O'Neil was a detective at the time of the investigation and served as lead detective on the case. At the onset of the investigation, Lieutenant O'Neil received information that authorities had arrested a juvenile for domestic violence and that during transport to juvenile detention, the juvenile alleged that he had been sexually molested. Lieutenant O'Neil directed the patrol officer who was transporting the victim to drive the victim to the Williamson County Children's Advocacy Center, a safe and child-friendly place for victims of abuse to give statements. On December 12, 2005, the victim gave Lieutenant O'Neil a statement. The victim told him about the sexual abuse he had endured by appellant. In describing some of the acts, the victim told him that on one occasion appellant got on top of the victim and placed the victim's penis in his mouth, had the victim lie in the opposite direction and give appellant a "hand job."

The victim gave Lieutenant O'Neil information that led him to believe that there may have been physical evidence available for collection, namely bodily fluid on pieces of furniture and carpet. Lieutenant O'Neil obtained a warrant and found the ottoman inside the home. He used a forensic tool called an "alternate light source," which, by emitting a certain wavelength of light, causes bodily fluids to fluoresce, allowing a viewer wearing proper goggles to determine the presence of evidence. Lieutenant O'Neil collected the ottoman, packaged it at the Brentwood Police Department, and forwarded it to the Tennessee Bureau of Investigation ("TBI") for further testing. He also retrieved the black belt that the victim alleged appellant used to whip him.

Based on his interview with the victim, Lieutenant O'Neil visited appellant's former house, and the owner allowed the police to test the carpet in the basement where appellant maintained his office. Lieutenant O'Neil viewed two areas of carpet that fluoresced and removed the carpet. He sent the carpet to the TBI for further testing.

Special Agent Chad Johnson, a forensic scientist with the TBI, testified as an expert witness. He stated that he established a genetic profile for appellant by testing a cheek swab provided by the Brentwood Police Department. He also tested several areas on the ottoman that fluoresced under the alternative light source. An acid phosphate test yielded negative results for the presence of semen, but a confirmatory procedure that tested specifically for the presence of sperm cells yielded positive results for the presence of sperm, which confirmed the presence of semen. Special Agent Johnson explained that acid phosphate, or AP, is a protein found in bodily fluids such as saliva, urine, and primarily semen, and it is subject to breaking down over time. He could not ascertain the age of a sample but could tell whether the bodily fluid had begun to degrade. He described DNA as being "more resilient to breaking down." He obtained a genetic profile from the DNA found on the ottoman and compared it to appellant's cheek swab. Special Agent Johnson testified that the two genetic profiles matched each other, and the statistical evaluation demonstrated that the same genetic profile would not be found in the population of the entire world.

Special Agent Johnson testified that he also tested the ottoman for the presence of amylase, a component of saliva. He found amylase on two areas of the ottoman. The DNA test on the area yielded only one genetic profile, that of appellant. Special Agent Johnson explained that the presence of only one genetic profile could be attributed to a larger amount of one individual's DNA and not much from another individual. He stated that the DNA from the sperm cells could have overshadowed the DNA from the amylase, or there was less DNA in the amylase sample than in the sperm cells. Based on his testing, he could not conclusively state that appellant's DNA was the only profile present on the ottoman.

Special Agent Johnson also tested the carpet in the area that surrounded the ottoman in appellant's former home. Again, the samples were negative for acid phosphate, but one sample was positive for the presence of sperm cells. The genetic profile matched appellant's profile, to the exclusion of the entire world's population.

Appellant testified in his own defense. He stated that he and his wife traveled to the Ukraine in July 2000 to adopt three children, the victim's sister, the victim, and the victim's brother A.Z., who were fifteen, ten, and seven years of age, respectively, at the time. The required medical examination found that the victim was visually impaired in one eye and was not circumcised. Appellant brought the children home in August 2000. His biological children were fourteen, twelve, and seven years old at the time.

The primary challenge the blended family experienced was the language barrier. Appellant hired Tina Gregory, an ESL teacher, to tutor the older children at home for one semester. A.Z. was kindergarten age, so he began school promptly in the fall of 2000. All of the children except A.Z. were home-schooled during that time. The older children entered the school system in January 2001. Appellant noticed that the victim was very athletic, so he enrolled the victim in soccer right away. Appellant said that he and the victim got along very well in the early days after the victim joined the family. The victim loved books and history and took an interest in appellant's industry. Appellant was very proud of the victim's football skills.

Appellant testified that when everyone first came to the United States, the younger boys seemed to take their problems to their older sister rather than to appellant's wife. This offended his wife, so she forbade the children from speaking Ukrainian in an attempt to unify the family and increase communication. Appellant disciplined the victim most often for his failure to take responsibility for his actions. Appellant testified that if one of his children took responsibility for his or her actions, there would be no further consequence, but that if he or she denied responsibility, he would spank them with a belt on bare bottoms. He recalled that he probably spanked the victim seven to ten times.

Appellant told the jury about his ongoing weight problem and explained that when he adopted the children, his waist measured sixty-eight to seventy inches in a standing position but expanded to approximately eighty-three inches when he was seated. His primary physician did not have scales that would weigh him, but scales at Vanderbilt recorded his highest weight at almost 430 pounds. He later found a "natural" doctor who helped appellant lose 150 pounds.

Appellant testified that he built their 7,000 square-foot home in Brentwood because everyone seemed crowded in their former home. In retrospect, he thought it was a mistake because everyone became "isolationists" in his or her own room. According to appellant, the victim spent an extraordinary amount of time on the computer. Because he had concerns about what the victim was viewing, appellant installed spyware on the computer that reported the victim had been viewing pornography. The victim's computer use and diminishing sense of responsibility around the home led appellant and his wife to create an internet contract between themselves and the victim. The contract specified that the victim would have unlimited access to the internet, provided that he completed his chores in a timely fashion, refrained from obscene or abusive language, exercised control over his behavioral outbursts, and participated in family day activities.

Appellant explained to the jury that he and his wife had owned the ottoman in question since 1995. He said that the victim knew that there was semen on the ottoman

because appellant told him. Appellant told the jury that different family members requested different pieces of furniture for their rooms in the new house in Brentwood. The victim showed an interest in the ottoman but asked appellant what the stain was. Appellant testified that he regretted explaining the stain to the victim but that it was his nature "to be pretty much straight up." Appellant told the jury that he and his wife had engaged in oral sex on the ottoman four or five times and that he had masturbated alone on more occasions. The couple could not engage in traditional sexual intercourse because their combined weight of 700 pounds made it impossible.

Appellant testified that he was "not the most endowed" man, and because of his weight, he could not access his penis in a standing or sitting position. His belly hung too far down. At full erection, appellant shared that his penis measured approximately three inches. He said that his bodily composition was inconsistent with the victim's rendition of the acts of abuse to which he testified.

Tina Gregory, the ESL teacher, testified that she worked with the victim, his sister, and his brother, A.Z., for eighteen months beginning in August, 2000. Part of her teaching method included instructing the children on various American idioms, such as "piece of cake" and "I aced that test." She encouraged the children to speak English all of the time because immersion was the best method for learning a new language. She joined the family for dinner one night and heard the children speak Ukrainian. She instructed them to speak only in English. Appellant expressed his frustration to her about their refusing to speak English.

Appellant's younger biological son testified that he and the victim developed a "good, steady brotherly bond" and enjoyed activities together. When the family moved into the new Brentwood home, the victim was the first person to have a computer installed in his room. Appellant's son testified that the victim became very involved playing with the computer, and it slowly divided the victim from the family. He also stated that the intercom system in the house had a function that allowed an individual to "listen" in on other rooms.

Appellant's younger son told the jury that he had been spanked between four and nine times in his life. The process was generally the same each time; the child would walk to appellant's downstairs office, remove his pants, and receive a spanking with a braided belt on the bare bottom. He denied ever having walked into the office and observing the victim either being disciplined or involved in a sexual activity with appellant.

Appellant's younger son described the confrontation between the victim and appellant's wife. According to him, he and his older brother were in the kitchen with their mother waiting on the victim to return downstairs to help select dessert. When the victim did

not come downstairs, appellant's two sons went downstairs in the home to disconnect the victim's internet connection at his mother's request. He did not actually see the victim push his mother. When he arrived upstairs, she was on the ground, hurt, and struggling to get up. Appellant's wife advised her son to call the police. He said "it seemed like she had some bruising, as well as she was just very frazzled."

Appellant's wife testified that she and appellant had been married for thirty-two years. She was a stay-at-home mother until 2006, when she returned to work for two years as an assistant at Franklin High School. She and her family were active in church.

Mrs. Zaloba testified that as the victim's computer use increased, his level of personal hygiene decreased. She told the jury that when the family moved into the new home on Mitchell Place, the victim became disobedient. In July 2005, she overheard yelling and cursing and thought the victim was playing a video game. She heard a loud noise and escalating voices. She went upstairs and saw appellant's glasses mangled. She also witnessed a gash on his nose. She saw the victim on the floor over appellant, about to choke him. She shouted at the victim to get off appellant and to get out.

In December 2005, following a family dinner, Mrs. Zaloba and the children were selecting a flavor of pudding to make for dessert. According to her, the victim "bolted" from the kitchen. She sent her sons to the basement to disconnect the victim's internet connection. She told the jury that the victim "came flying in," arguing with her about the internet contract. Mrs. Zaloba testified that the victim came from behind her and pushed her forcefully, sending her into the great room where she grazed the Christmas tree, landed on a large present, fell, and suffered bruises and contusions. She yelled for someone to call 9-1-1; however, she did not appear in juvenile court to prosecute the case. Mrs. Zaloba testified that she never felt any gratitude from the adopted children for all that the Zaloba family did for them and all that the family bought them.

Appellant's daughter testified that prior to adopting the children from the Ukraine, her parents discussed the idea with the biological children. She was excited about the prospect of adopting children and traveled with her parents to the Ukraine. She told the jury that in the afternoons after school, she and the other children would enter the home through appellant's office in the basement. She had a key to the office. They would say "hello" to appellant, bring him the mail, and then go upstairs. Appellant's daughter was never very close with the victim. She testified that he was "unwilling" to form a relationship with her. He would not always embrace her attempts to hug him. She further testified that the victim's computer use put a strain on everyone in the family. She did not believe the accusations the victim made against appellant because there were incidents that caused her to doubt the victim's truthfulness and because her father was her best friend. Appellant's daughter

-12-

testified consistently with Ms. Zaloba about the incident in the Zaloba's kitchen in December 2005.

Dr. Barry Bates, who holds a Ph.D. in human performance with an emphasis in biomechanics, testified as an expert on appellant's behalf. Dr. Bates stated that he conducted two assessments of appellant. As a result of his assessments, he formed the opinion that it was "improbable" that appellant could have performed sexually in a sitting or standing position. Dr. Bates testified that appellant's penis was not "reasonably accessible." Appellant was morbidly obese and carried most of his weight around his midsection. He had a greater than normal suprapubic fat pad around his penis and genital area. Dr. Bates observed appellant clothed and unclothed in various positions such as sitting, standing, and lying down. He took several measurements of appellant. Another person could access appellant's penis when appellant was in a standing position. It was buried beneath the fat pad so appellant could not access it himself, but someone else could.

Appellant presented character witnesses Michael Briggs and Darrell Darnauer to testify to appellant's truthfulness. The State presented rebuttal witnesses Rick White, Patty White, Linda Wittenberg, and Duane Ward to testify to the victim's truthfulness.

### III. Analysis

### A. Assignments of Error at Trial

### 1. Admission of Evidence of Abuse of Victim's Brother

Appellant filed pre-trial motions in limine and motions to suppress statements that his attorneys anticipated the State eliciting from the victim. During the hearing, the State and appellant informed the trial court about an incident wherein the victim heard A.Z. (the victim's brother) refer to appellant as "Michael Jackson." A.Z.'s comment was precipitated by appellant asking A.Z. to accompany him downstairs, and A.Z. refusing. The reference caused the victim to reflect on the meaning of A.Z.'s statement and inquire further of him. Upon conferring with A.Z., the victim learned that appellant allegedly had been sexually abusing A.Z. This revelation, according to the victim, enraged him, causing him to enter into an altercation with his adoptive mother and to ultimately be charged with domestic assault of her. One of appellant's children called the police during the altercation. The police arrested the victim and placed him in the police car. On the way to the juvenile detention center, the victim disclosed that he had been sexually abused by appellant years before and that he became angry when he learned that his younger brother was now subject to the same abuse.

At the first hearing on appellant's motions, appellant argued that the proffered evidence fails the 404(b) test of the Tennessee Rules of Evidence in that the evidence was not relevant to a material issue in the case; it was not proven by clear and convincing evidence; and the probative value did not outweigh the danger of unfair prejudice. The State countered that the evidence was necessary to provide a contextual background so that the jury would not wrongly assume that the victim concocted the allegations of abuse against appellant years after the abuse had ended simply to avoid legal trouble. The trial court ruled that the absence of the evidence would create a conceptual and chronological void in the State's case, which would, in turn, result in confusion of the jury. The jury could believe that the victim's late disclosure of abuse was retaliatory. The court stated that it must balance possibly "spurious allegations" against the danger of "intentionally misleading the jury." While the trial court noted that some prejudice would accrue to appellant, it would minimize the prejudicial effect of the evidence with a limiting instruction both at the time the testimony was given and at the close of the case.

Appellant requested that the trial court consider limiting the purview of the State's evidence, allowing it only to elicit testimony from the victim that he "was afraid [his brother] may be subject to abuse." The State responded that appellant's solution contained inaccurate statements. The trial court suggested that the victim could testify that he heard his brother make the "Michael Jackson" comment and that based on a subsequent conversation, he was concerned about abuse toward his little brother. Further, the victim could testify that because he was not going to allow the abuse against his brother, the victim had an altercation with appellant's wife and subsequently disclosed the abuse he had suffered to the police. The court prohibited testimony from any other witness concerning the allegations of abuse against A.Z. because the evidence pertained only to the state of mind of the victim.

Appellant filed a motion to reconsider, asking the trial court to revisit its ruling on the proffered evidence. Appellant argued that the trial court issued a prospective ruling on rehabilitation of the credibility of a witness and asked the court to reserve ruling on the evidence until credibility became an issue at trial. In support, appellant put forth that if the victim were to testify to allegations of abuse against A.Z., appellant would then be in the position of having to testify with regard to both victims, which would in turn open the door to the State calling A.Z. as a rebuttal witness, leading to a de facto joinder of the severed counts of the indictment. Appellant pointed out that the State had plenty of other evidence to explain why the victim waited so long to disclose the abuse, such as embarrassment, fear, and the fact that appellant told him that what they were doing was not "sex" so it was okay and that boys and their fathers should engage in such acts. The trial court asked the State why it could not reserve ruling on the issue. The State countered that it could be placed in a position of appellant waiting until closing arguments to argue that the victim's disclosure was retaliatory and contrived, and the State would be without recourse to rebut the argument.

Appellant told the court that he was entitled to argue the inference to the jury. The trial court advised that it would issue a ruling at a later time.

After jury selection but before the trial began, the court held a jury-out hearing regarding the victim's anticipated testimony. The State questioned the victim, "You overheard a comment that [led] you to believe that Bob might be engaged in this kind of sexual contact with someone else?" The victim said, "Yes." The State then asked if, based on the comment, the victim became angry all over again, to which he responded, "Yes." He testified that he confronted appellant and had a fight with appellant's wife the following day. He testified further about his conversation with the arresting officer about wanting to be emancipated. Appellant argued that while the victim's testimony was more "watered down" than previous versions, the jury would logically infer that the comment related to the victim's brother. He also admitted, "Certainly this version is not nearly as prejudicial as the version [the prior trial judge][4] had already ruled would come in," but stated that the comment nonetheless precluded a thorough cross-examination of the victim without opening the door to specifics about the allegations regarding A.Z. The trial court allowed the testimony, cautioning the State not to mention it in its opening statement.

Specifically, at trial, the exchange between the State and the victim was as follows:

STATE:   "In December of 2005, after [the internet usage] agreement, did you overhear a comment that lead [sic] you to believe that [appellant] might be engaged in sexual contact with someone other than yourself?"

VICTIM:   "Yes, ma'am."

STATE:   "Based on that comment, did you get angry again about the abuse?"

VICTIM:   "Yes, ma'am."

The State did not mention the evidence during its opening statement but briefly referred to it in its closing argument. Immediately following further brief testimony from the victim regarding the altercation between him and Mrs. Zaloba, the trial court instructed the jury:

I need to tell you that from time to time[,] it may be appropriate for me to give you a limiting instruction regarding how to consider any particular evidence.

_____

[4] The pre-trial motions were ruled upon by a judge other than the judge who presided at trial.

-15-

In this instance, I need to instruct you that the testimony you just heard regarding statements overheard by [the victim] shall not be considered as proof against [appellant]. Instead, you must only consider the statement for its effect on [the victim's] alleged state of mind on December 12, 2005.

In addition, the trial court instructed the jury during its final instructions that

[t]estimony that you have been instructed to disregard is not evidence and must not be considered. If evidence has been received only for a limited purpose, you must follow the limiting instructions that I have given you. You are to decide the case solely on the evidence received at trial.

Appellant argues, on six separate grounds, that the trial court erred in allowing the State to introduce evidence that the victim's brother may have also been abused by appellant. Appellant couches his argument in the following terms: (1) the trial court erred by denying appellant's motion to suppress and motion in limine concerning the statements; (2) the trial court erred in denying appellant's pre-trial motion to reconsider its ruling; (3) the trial court erred by failing to exclude all references to a second victim after it conducted a jury-out hearing; (4) the trial court erred by allowing the State to elicit said testimony from the victim during its direct examination; (5) the trial court failed to cure the error by denying appellant's motion for a mistrial; and (6) the trial court erred by allowing the State to reference the second victim in closing arguments. The State contends that the evidence was admissible to show a contextual background so that the jury would not assume that the allegations made by the victim were concocted in retaliation for being arrested. Regardless of the approach, central to the resolution of this issue is one inquiry: was evidence that the victim learned of possible sexual relations between appellant and another individual admissible in appellant's trial.

The common denominator of appellant's arguments involves application of Rule 404(b) of the Tennessee Rules of Evidence. When it substantially complies with the procedural requirements of Rule 404(b), the trial court's determination of admissibility is entitled to deference on appeal. *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008); *see State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). In reviewing a trial court's ruling on 404(b) evidence, an appellate court may not disturb the lower court's ruling absent an abuse of discretion. *Gilley*, 297 S.W.3d at 758 (citing *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005)). The term "discretion" indicates "the absence of a hard and fast rule," thus, we will reverse a trial court's evidentiary ruling admitting evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (citing *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). "An abuse of

discretion standard contemplates that a trial court's ruling will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2010). Although a decision made under the "abuse of discretion" standard will not be lightly reversed on appeal, the discretion of the trial court is not unlimited. *Id.*

We begin with the threshold proposition stated in Rule 404(b) of the Tennessee Rules of Evidence, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." The evidence may, however, be admitted for other purposes, such as to prove identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. In a case involving evidence of other crimes, wrongs, or acts, the trial court must carefully scrutinize the relevance of the evidence and the reasons given by the State for offering it. *Gilliland*, 22 S.W.3d at 271.

The determination of whether evidence is "relevant" is governed by the general standard of Rule 401 of the Tennessee Rules of Evidence. The rule states that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; *see also Gilliland*, 22 S.W.3d at 271. The supreme court stated in *Gilliland*:

> Although this standard provides a relatively lenient threshold for admitting evidence, general background evidence used to relate the full story of the offense is rarely probative of an actual material issue at trial. Consequently, background evidence used to show the context of events may not always pass even this low threshold of admission when strictly subjected to the requirements of Rule 401.
>
> Nevertheless, as the Rules of Evidence recognize, a strict application of the Rules may work unnecessary hardship in some cases, and the Rules should be flexibly construed to achieve a just, speedy, and inexpensive determination of the proceedings. A general policy that bars background evidence merely because it does not directly bear upon a material issue ignores the fact that such evidence is often crucial to understanding the other material evidence at trial, and the absence of background evidence could have detrimental effects on the jury's comprehension of the offense in question. Events do not occur in a vacuum, and in many cases, knowledge of the events surrounding the commission of the crime may be necessary for the jury to realistically evaluate the evidence.

. . . A careful balance must be maintained so as not to allow background evidence to rupture the general prohibition against evidence offered only to show criminal propensity.

This balance is partially achieved in Tennessee by the additional requirement in Rule 404(b)(3) that evidence of other crimes, wrongs, or acts must be excluded if the unfair prejudice outweighs the probative value or is dangerously close to tipping the scales. Nevertheless, this balance is not completely achieved, because there is no uniform standard in this state by which to determine, in the first instance, when background evidence involving other crimes, wrongs, or acts may be offered for other purposes under Rule 404(b). Although such a standard should be narrowly drawn to avoid the negative implications associated with criminal propensity evidence, the standard should not be so narrow as to sacrifice the jury's understanding of the necessary context of the case. Accordingly, we hold that contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be offered as an other purpose under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case.

To clarify this holding in terms of Rule 404(b), when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

*Gilliland*, 22 S.W.3d at 271-72 (internal citations and quotations omitted). In the instant case, the trial court complied with the procedures set forth by our supreme court in *Gilliland* and made the three required findings on the record.

Appellant begins his argument with the proposition that, once the counts involving A.Z. were severed from those involving V.Z., evidence pertaining to the former were not relevant in a trial of the latter. The trial court found that the evidence was relevant because the jury might be misled to assume that the victim's disclosure was retaliatory in nature. As

our supreme court noted in *Gilliland*, "A general policy that bars background evidence merely because it does not directly bear upon a material issue ignores the fact that such evidence is often crucial to understanding the other material evidence at trial," and further, that "the absence of background evidence could have detrimental effects on the jury's comprehension of the offense in question." *Id.* at 271-72. The fact that the evidence does not tend to make the existence of "any fact that is of consequence . . . more probable or less probable" is not strictly determinative of this issue. *See* Tenn. R. Evid. 401. We conclude that the abbreviated testimony from the victim regarding his state of mind upon hearing of possible abuse against another individual was, indeed, relevant to the jury's understanding of the background of the case.

The trial court also addressed whether prejudice would accrue to appellant, determining that while some prejudice would result, the court would minimize the prejudicial effect of the evidence with a limiting instruction. The trial court did not conclude that the probative value was outweighed by the danger of unfair prejudice. We agree. While appellant argues that the State could have relied upon other proof to fill any conceptual void created, the trial court realized, and appellant confirmed, that a likely end result would be appellant arguing for the first time during closing argument that the victim's delayed disclosure was retaliatory and that the State would have no recourse by which to overcome the inference at that point.

The trial court admitted the "watered down" version of the victim's testimony that he overheard a comment that led him to believe that appellant was involved in sexual relations with another person. Appellant asserts that the evidence did not show the state of the mind but rather "established the propensity of [appellant] to sexually abuse children." Because the person was not named, the jury did not have information pertaining to the age of the other person and could not have known that appellant was accused of additional counts of rape of a child involving a different victim.

In a similar vein, appellant claims that the trial court's admission of the evidence in question effectively denied him the opportunity to confront the alleged "second victim." The State responded, and we agree, that the jury was only offered information that appellant might be engaged in sexual relations with another person. The State chose the word "person" rather than "victim," clearly avoiding the inference of a second victim. Moreover, the reference was gender-neutral.

Appellant urges this court to look to the rules regarding severance of counts of an indictment in determining this evidentiary issue, maintaining that the State's reference to other sexual acts constituted a "de facto joinder" of all counts of the indictment. Severance of the counts of appellant's indictment is not at issue on this appeal; this issue deals

specifically with whether the trial court abused its discretion in ruling on the admissibility of evidence. We decline to graft such a rigid interpretation onto a determination of this issue because, as our supreme court noted, the "standard [for admissibility] should not be so narrow as to sacrifice the jury's understanding of the necessary context of the case." *Gilliland*, 22 S.W.3d at 271-72. As stated above, the "other person" was not named, thus evidence pertaining to another individual did not necessarily imply to the jury that other charges were pending against appellant.

Appellant contends that Rule 404(b) of the Tennessee Rules of Evidence is a "rule of exclusion," and its procedural safeguards must be followed by the trial court. He maintains on appeal that the trial court failed to address the third procedural safeguard, that the proof of the other crime, wrong, or act was clear and convincing. Our interpretation of the *Gilliland* decision leads to the conclusion that strict compliance with the traditional Rule 404(b) analysis is superceded by the three-part test announced by our supreme court when such evidence is offered solely to provide a contextual background. *See Gilliland*, 22 S.W.2d at 272 ("*To clarify this holding in terms of Rule 404(b)*, when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case," the State must prove and the trial court must find the existence of the three factors listed therein) (emphasis added). Although *Gilliland* was decided before Rule 404(b) was amended in 2003 to include the "clear and convincing" standard, this standard of proof has been required by Tennessee case law both before and after adoption of the rules of evidence. *See* Tenn. R. Evid. 404(b), Adv. Comm'n Cmts. Had our supreme court intended contextual or background evidence to meet the clear and convincing standard, it would not have included a different standard in the *Gilliland* opinion. Appellant's assignment of error with regard to the trial court's failure to find that the evidence was clear and convincing is not germane to our determination of this issue.

Appellant further claims that the victim's testimony pertaining to sexual relations with another individual was inadmissible hearsay. We reject appellant's argument. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). The testimony in question comprised of the victim's affirmative responses to the State's questions, "In December of 2005, . . . did you overhear a comment that lead [sic] you to believe that [appellant] might be engaged in sexual contact with someone other than yourself?" The State continued, "Based on that comment, did you get angry again about the abuse?"

Declarations are not classified as hearsay when they are used to prove the effect on a listener:

[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

*State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *15 (Tenn. Crim. App. Sept. 30, 2010), *perm. app. denied* (Tenn. March 9, 2011) (citation omitted); *see also State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (the victim's statement to the defendant did not constitute hearsay as it "was probative . . . because of its effect on the hearer").  The "statement" in question in this case was not hearsay because it was offered to show the effect on the victim's state of mind.

Appellant asserts that the trial court should have granted a mistrial based on the admission of the evidence in controversy.  Declaring a mistrial serves to repair the damage done to the judicial process when an occurrence at trial renders an impartial verdict impossible.  *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).  A trial court may declare a mistrial if it appears that some matter has occurred that would prevent the jury from reaching an impartial verdict.  *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977).  A trial court should only declare a mistrial in criminal cases in which a manifest necessity requires such action.  *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is appropriate "when a trial cannot continue or a miscarriage of justice would result if it did."  *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994).

This court will review the trial court's decision to grant or deny a mistrial for abuse of discretion.  *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (citing *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990)).  In reviewing the trial court's decision granting or denying a mistrial for abuse of discretion, this court considers three factors: (1) whether the State elicited the testimony; (2) whether the trial court gave the jury a curative instruction; and (3) the relative strength or weakness of the State's proof.  *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *10 (Tenn. Crim. App. Feb. 14, 2003)).  The party requesting the mistrial bears the burden of establishing the necessity for it.  *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In this case, the State merely elicited an affirmative response to the question posed to the victim.  The State's question did not come as a surprise because the trial court ruled on its admissibility several times before the trial began.  The trial court admonished the jury with a limiting instruction on the use of the testimony.  Finally, contrary to appellant's assertions, the State's case against appellant was relatively strong.  The trial court did not abuse its discretion in denying appellant's request for a mistrial.

As a final assignment of error, appellant argues that the trial court should not have permitted the State to refer to the testimony involving the second victim in its closing argument. For clarity, we re-state that the testimony did not refer to a second *victim*. The question referred to another person only. In a jury-out hearing prior to closing arguments, the trial court informed the State that it preferred the State not mention the controverted evidence in its closing but that it could not preclude the State from doing so.

During the defense's closing argument, appellant's counsel argued that the victim's disclosure to the police while in the police car was contrived to avoid legal repercussions of his altercation with Mrs. Zaloba. Appellant argued, "[He] is placed in the back of a police car. And what does he do? . . . He says, 'Officer, I was molested by [appellant].' And voila, he has diffused a ticking time bomb, and . . . the route changes[,] and he's shuttled over to the advocacy center." Appellant also highlighted the victim's failure to disclose the abuse to anyone prior to December 12, 2005. On rebuttal, the State countered appellant's argument, stating,

> Now, the defense wants you to believe that, well, it was because he was being arrested. "Well, he's being arrested. He's being hauled away to juvenile court." He'd already been in trouble one time, yes. But if you'll recall from the proof from what [the prosecutor] said, she asked [the victim] about the day before the incident happened with [Mrs. Zaloba], "Did you hear a comment that [appellant] may have been engaged in sexual conduct with someone else?["] And he said, "Yes." And he said how all that anger came back. And [the prosecutor] asked him, "Did you confront [appellant] about that?" And [the victim] said, "Yes." That's what was going on the day before the incident that the police were called. Is it reasonable what [the victim] told you[,] that he was frustrated because, after years of what that man did to him, he was the one being taken off to jail? That's what's reasonable. That's what's credible, I would submit to you, ladies and gentlemen.

Although the State elected to review the testimony briefly to the jury in closing arguments, it did so only in rebuttal to the defense's specific arguments. The State fairly characterized the evidence from trial, did not embellish the testimony, and moved forward in its argument without placing undue emphasis on the victim's testimony.

Clearly, the trial court issued a preemptive suggestion to the State about avoiding the questioned testimony because the nature and enthusiasm of closing arguments can often escalate. The State did not stray afield from the accurate recitation of the facts developed at trial. Appellant is not entitled to relief on this claim.

Evidence that the victim learned of sexual relations involving another person was admissible at appellant's trial to explain the contextual void of why the victim's disclosure was delayed. The trial court properly denied appellant's motion to suppress, motion in limine, motion to reconsider, and motion for mistrial, and properly permitted the State to argue the evidence in its closing argument to the jury. For the reasons stated herein, appellant is not entitled to relief on this issue.

2. The Trial Court's Failure to Admit the Victim's Prior Inconsistent Statement as Substantive Evidence Pursuant to Tennessee Rule of Evidence 803(26)

Appellant assigns as error that the trial court incorrectly excluded the victim's prior inconsistent, recorded statement as substantive evidence. The trial court disallowed the evidence based upon Tennessee Rule of Evidence 106, the "rule of completeness" that requires introduction of a complete writing or statement rather than excerpts therefrom under certain circumstances. Appellant argues that Rule 803(26) of the Tennessee Rules of Evidence permits admission of prior inconsistent statements pursuant to procedural safeguards, but specifically excludes consistent statements, thus, Rule 106 is inapplicable to determination of the issue.

Tennessee Rule of Evidence 106, the "rule of completeness," reads:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Admissibility of prior inconsistent statements for impeachment purposes is governed by Tennessee Rule of Evidence 613:

(a)     Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b)     Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice

otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 803(1.2).

(c)     Opinions. A prior statement in opinion form is admissible to impeach testimony.

Finally, precedent for admissibility of prior inconsistent statements as substantive evidence is found in Tennessee Rule of Evidence 803(26). Rule 803 of the Tennessee Rules of Evidence sets forth certain enumerated exceptions to the hearsay rule:

Prior Inconsistent Statements of a Testifying Witness. A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:

(A)     The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B)     The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C)     The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26).

This court released an opinion squarely deciding this issue on February 17, 2012. *See State v. Charles Jackson*, No. W2010-01133-CCA-R3-CD, 2012 WL 543047, at \*9-11 (Tenn. Crim. App. Feb. 17. 2012). Because appellant was tried in 2010 and the appellate case was briefed in 2011, neither the trial court nor appellant had the benefit of the *Charles Jackson* case at trial. In *Charles Jackson*, we considered the precise issue raised herein by appellant, whether an entire statement by a witness that contains both consistent and inconsistent statements should be admitted as substantive evidence. *Id.* We answered that question in the negative, ruling:

The title of Tennessee Rule of Evidence 803(26) plainly states that it applies to prior inconsistent statements, and the Advisory Commission Comments to the rule explain that the rule's reference to Tennessee Rule of Evidence 613 "makes clear that only prior inconsistent statements, and not consistent

-24-

statements, are within the ambit of this rule." Our review of [the witness's] statement reveals that much of it was consistent with her trial testimony. Therefore, those consistent portions of her statement were not admissible pursuant to Tennessee Rule of Evidence 803(26).

*Id.* at *10.

In this case, appellant sought to utilize a videotaped statement by the victim in which he denied that appellant sexually abused him in the apartment at Alara Farms. The statement was crucial to the defense, appellant argued, because the State elected abuse at the apartment as grounds for one of the counts of rape of a child. The State objected to admission of the videotaped statement, citing the rule of completeness. The trial court stated, "I don't think [Rule 803(26)] precludes the rule of completeness. I think there is still an issue of that." It subsequently stated, "The court does not think that the jurist[s] intended to completely obviate the rule of completeness in this matter." The court ultimately denied appellant's request to play the videotaped recording of the victim's statement for the jury but allowed him to question the victim from the transcript. The trial court's ruling was erroneous. Pursuant to our decision in *Charles Jackson*, the prior inconsistent statements should have been admitted, and the jury should have been allowed to consider the statements as substantive evidence and not merely as impeachment evidence.

As in *Charles Jackson*, we must next consider whether the trial court's ruling was harmless.[5]  *Charles Jackson*, 2012 WL 543047, at *11. The scope of our harmless error review is found in Tennessee Rule of Appellate Procedure 36(b):

> A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

When appellate courts conduct a harmless error review, our "'analysis is more than simply a calculation of whether sufficient evidence exists to support the conviction.'" *State v. Ferrell*, 277 S.W.3d 372, 380 (Tenn. 2009) (quoting *State v. Rodriguez*, 254 S.W.3d 361, 374 (Tenn. 2008)). Appellate courts must carefully examine the entire record to determine

---

[5] This error is deemed a non-constitutional error. *See State v. Rodriquez*, 254 S.W.3d 361, 371-72 (Tenn. 2008).

whether the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *Id*. (quoting *Rodriguez*, 254 S.W.3d at 374).

In this case, the jury had before it testimony concerning the victim's prior inconsistent statements to law enforcement contained in the videotape. Appellant scrupulously cross-examined the victim in that regard. Appellant also questioned Detective O'Brien with respect to the victim's inconsistent statements. Although the statements were not presented to the jury as substantive evidence, it nonetheless had the content of the victim's statements before it for consideration. We conclude that the error in the trial court's ruling did not affect the jury's verdict.

### 3. Trial Court's Failure to Instruct the Jury that Victim's Prior Inconsistent Statement Was Substantive Evidence

In a related issue, appellant claims that the trial court compounded its erroneous ruling on the inadmissibility of the victim's prior inconsistent statements by refusing to instruct the jury that the victim's statements could be used as substantive evidence. After the court ruled that appellant could question the victim from a transcript of his prior inconsistent statements, appellant requested a jury instruction that the statements could be used as substantive evidence pursuant to rule 803(26). *See* Tenn. R. Evid. 803(26). The State objected on the basis that the statements did not become "substantive" until, pursuant to Rule 613 of the Tennessee Rules of Evidence, it had the opportunity to question the witness about the inconsistency. The trial court sustained the State's objection and denied appellant's request. After the State had an opportunity to question the witness thoroughly, appellant again requested a jury instruction allowing the statements to be used as substantive evidence, which the trial court denied.

In his brief, appellate cites no authority in support of this issue. Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure states that an appellant's brief shall contain the following with respect to an argument:

(A)   the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

(B)   for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues)[.]

Tenn. R. App. P. 27(a)(7)(A)-(B).  Moreover, Rule 10(b) of the Rules of the Court of Criminal Appeals reads, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court."  Appellant's argument contains neither a statement of the applicable standard of review nor citation to any legal authority.  This issue is waived for appellate review.

Waiver notwithstanding, we have previously determined that the statements in question should have been admitted as substantive evidence, but the failure to do so was harmless error.  Because the evidence was not received as substantive evidence, the trial court was not obligated to instruct the jury as such.  However, for the reasons stated above, we conclude that the trial court's failure to instruct the jury that it could consider the statements as substantive evidence did not affect the verdict in this case, and appellant is not entitled to relief.

4.  The Trial Court's Instructions to the Jury Containing "Recklessly" as a Mens Rea.

Appellant argues that the trial court erred by instructing the jury that "recklessly" was a culpable mental state for the crime of child rape.  The State asserts that the instructions were a correct statement of the law and that any error was harmless.  We agree with the State.

It is axiomatic that in criminal cases, a defendant has a right to a correct and complete jury charge of the law under which he was accused. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000).  The trial court must list and define the material elements of the charged offense.  *State v. Ducker*, 27 S.W.3d 889, 899 (Tenn. 2000).  A court's failure to do so violates a defendant's constitutional right to a trial by jury and requires a reviewing court to conduct a harmless error analysis. *Garrison*, 40 S.W.3d at 433-34. However, a jury instruction must be reviewed as a whole rather than in isolated parts. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

In Tennessee, the culpable mental states applicable to criminal offenses are defined with respect to three possible conduct elements of an offense; the conduct elements may be found either alone or in combination with one another within one offense's statutory definition. *State v. William Thomas Branch*, No. M2005-01125-CCA-R3-CD, 2006 WL 1932705, at *6 (Tenn. Crim. App. July 10, 2006), *perm. app. denied* (Tenn. Nov. 6, 2006) (citing Tenn. Code Ann. § 39-11-302)).  The conduct elements include: the nature of the conduct, the circumstances surrounding the conduct, and the result of the conduct. *Id.* "Nature of the conduct" pertains to the proscribed act or the manner in which the defendant

acts. *Id.* "Circumstances of the offense" relates to the defendant's culpability. Finally, "result of the conduct" requires that the defendant's actions must be a physical cause of the harmful result. *Id.*

Our legislature determined that the statutory definitions of culpable mental states apply as follows:

> "[I]ntentional" refers to the nature of the conduct or to a result of the conduct; "knowing" refers to the nature of the conduct, the circumstances surrounding the conduct, or the result of the conduct; and "reckless" refers to the result of the conduct or to the circumstances surrounding the conduct, but not to the nature of the conduct.

*Id.* at *6. With regard to the nature of the conduct pertaining to a charge of child rape,

> [w]e acknowledge a split of authority within our Court on this issue. In *State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034 (Tenn. Crim. App. Nashville, Nov. 30, 2004), *perm.* [*app.*] *denied*, (Tenn. Mar. 21, 2005), this Court stated that the elements of rape of a child are unlawful sexual penetration of the victim and the victim being less than thirteen. The unlawful sexual penetration of the victim was categorized as both nature of the conduct and result of the conduct. 2004 WL 2726034, at *13. The panel also held that the victim's age element was a circumstance surrounding the conduct. *Id.* Because the crime of child rape contained all three conduct elements, a jury could find the defendant guilty by determining the defendant acted intentionally, knowingly, or recklessly. *Id.* at *14. The opposing view is contained in *State v. Weltha Womack*, No. E2003-02332-CCA-R3-CD, 2005 WL 17428 (Tenn. Crim. App., Knoxville, Jan. 4, 2005). Therein, a panel of this Court held that sexual penetration as used in the offense of aggravated rape was a nature of conduct element. 2005 WL 17428, at *9. The *Womack* [c]ourt determined that the inclusion of recklessness in the jury instruction was reversible error in permitting a conviction based on reckless penetration. *Id.*

> Our supreme court has not specifically addressed the issue. Even if this panel were to conclude that the jury instructions were erroneous in this case, in our view the error would be harmless beyond a reasonable doubt. The evidence was legally sufficient to support the child rape convictions, the prosecution argued only intentional penetration, and a defense of reckless penetration was never raised. *See State v. Homer Alson Maddin, III*, 192 S.W.3d 558, 562

(Tenn. Crim. App. 2005) . . . . The jury instruction neither misled the jury nor prejudicially affected the judgment or the judicial process. Accordingly, this issue does not provide [appellant] relief.

*State v. Johnny Lynn*, No. M2008-00532-CCA-R3-CD, 2009 WL 1812419, at *5 (Tenn. Crim. App. June 25, 2009), *perm. app. denied* (Tenn. Sept. 1, 2009). We agree with the panel's rationale in *Johnny Lynn*. Even if this court were to find that the trial court's instructions were erroneous, the error would be harmless. As in *Johnny Lynn*, the State's theory of the case was intentional penetration only. Reckless penetration was neither argued by the State nor asserted by appellant as a defense. The jury instruction did not mislead or confuse the jury or prejudice appellant in any way. Appellant is not entitled to relief on this issue.

### 5. Appellant's Right to a Unanimous Jury Verdict

Relying on *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), and *State v. Forbes*, 918 S.W.2d 431 (Tenn. Crim. App. 1995), appellant argues that the trial court's use of the disjunctive "or" in instructing the jury on culpable mental states violated his right to a unanimous jury verdict. We disagree.

This court has thoroughly discussed the implications of *Page* and *Forbes* to a determination of this issue. *See State v. Hood*, 221 S.W.3d 531, 547 (Tenn. Crim. App. 2006). Following our analysis of the two cases, we held:

> Generally, alternative theories, mental states, modes of committing the crime, or means by which the crime was committed may be submitted to the jury without the necessity of precautions to assure jury unanimity. Our research reveals, and the defendant has cited, no authority which would persuade us to conclude that the use of the word "or" in listing the alternative culpable mental states for the offense of aggravated rape violates state and federal constitutional protections against the possibility of non-unanimous jury verdicts.

*Id*. at 547-48. As in *Hood*, appellant has cited no authority that stands for the proposition that use of the disjunctive in listing the alternative culpable mental states violates his right to a unanimous jury verdict. Appellant is not entitled to relief on this issue.

B. Assignments of Error at Sentencing

1. Trial Court's Rejection of Appellant's Mitigation Evidence

Appellant's offenses occurred prior to the 2005 amendments to the Sentencing Act. Thus, he was given the option of being sentenced in accordance with the applicable law at the time or the current provisions. He elected to be sentenced pursuant to the pre-2005 Sentencing Act. Tennessee Code Annotated section 40-35-112(a)(1) mandated the sentencing range for a Range I Class A felony as fifteen to twenty-five years. Section 40-35-210(c) set forth the presumptive sentence for a Class A felony at the midpoint of the range, or twenty years, if there were no enhancement or mitigating factors. Appellant contends that the trial court erred by failing to consider his lack of criminal history pursuant to the "catch-all" mitigating factor set forth in section 40-35-113(13) and urges this court to reduce his sentence for each count of rape of a child to fifteen years.

When an accused challenges the length and manner of service of a sentence, this court conducts a de novo review[6] on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). We condition this presumption upon "the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). We do not apply the presumption to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court predicated upon uncontroverted facts. *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); *State v. Bonestel*, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In conducting a de novo review of a sentence, we must consider (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel about sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; (h) any statements made by the accused in his own behalf; and

---

[6] This standard of review should be applied in this case because appellant elected to be sentenced according to the law in effect prior to the 2005 amendments to the Sentencing Act. In *State v. Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012), the Tennessee Supreme Court modified the appellate standard of review of sentencing issues from "de novo with a presumption of correctness" to "abuse of discretion with a presumption of reasonableness." This change in the law does not affect the outcome of this case because the new standard grants the trial courts greater discretion than the prior standard.

(i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *Ashby*, 823 S.W.2d at 169.

After hearing the evidence pertaining to mitigating circumstances, the trial court ruled:

The Court has heard the testimony in this case, and while it does recognize that there is no criminal history of [appellant], and recognizes the testimony regarding his past, the Court does not find this to be an appropriate case in which the Court should recognize those issues as a mitigating factor for purposes of shortening the sentence in this matter.

While appellant points this court to cases in which we have agreed with the trial court's consideration of section 40-35-113(13), he has provided no authority for the proposition that a trial court erred in failing to apply the "catch-all" factor. Our research has failed to discover any such mandate.

Although lack of a criminal history was not a "statutory" factor, *see e.g.,* Tenn. Code Ann. § 40-35-113, the trial court had the discretion to consider any factor consistent with the purposes of the chapter. Tenn. Code Ann. § 40-35-113(13). However, it is left to the sound discretion of the trial court whether to apply the so-called "catch-all" provision of section 40-35-113(13). *See State v. Danny Boyd Cagle*, 1993 WL 473281, at *2 (Tenn. Crim. App. Nov. 18, 1993) (when trial court was aware of these considerations when imposing sentences, this court declined to conclude that the trial court abused its discretion in rejecting the mitigating circumstance). Appellant does not contend that the trial court improperly considered the pertinent sentencing principles or the facts and circumstances of this case, and we ascertain that it followed the requisite procedure. Because the trial court did not abuse its discretion in its rejection of appellant's mitigation evidence, we uphold the trial court's decision.

### 2. The Trial Court's Imposition of Consecutive Sentences

The determination by the trial court of consecutive or concurrent sentencing should not be disturbed on appeal absent an abuse of discretion. *State v. Blouvet*, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). A trial court may, in its discretion, order sentences to run consecutively to each other if it finds one of seven criteria by a preponderance of the evidence. Tenn. Code Ann. § 40-35-115(b). Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." *Id.* § 40-35-102(1). The

length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2).

In this case, the trial court found:

> [Appellant] is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the [appellant] and the victim or victims, the time span of [appellant's] undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

*Id.* § 40-35-115(b)(5). The trial court placed great emphasis on the nature of the relationship between appellant and the victim, stating that "the relationship was based upon an adoption from a foreign country . . . [s]o the relationship between the defendant and the victim, in the Court's mind, would weigh in favor of at least some sort of consecutive sentencing in this matter." The trial court also noted the three-year time span of appellant's abuse of the victim, commenting that it was "a fairly substantial period of time . . . ." The court reasoned that while the sexual acts at issue were not as egregious as some cases, appellant's abuse of the victim should not be minimized. Appellant forced the victim to perform oral sex on him, appellant performed oral sex on the victim, and on one occasion, appellant ejaculated into the victim's mouth. Based on these facts, the trial court found the "nature and scope . . . to be very concerning."

The relationship between appellant and the victim cannot be contested. Appellant was the victim's adoptive father. Appellant correctly notes that while the familial relationship is an important consideration, it does not necessarily justify consecutive sentencing in and of itself. Appellant asserts that the time span of appellant's undetected sexual activity should not be considered because the majority of the incidents underlying the counts in the indictments occurred within a few months of each other. However, the victim testified that the abuse spanned over three years. The trial court credited the victim's testimony. Even if the abuse spanned a few months, as appellant urges, the trial court's imposition of consecutive sentences would have been justified nonetheless. *See State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999) (among the circumstances that justified imposition of consecutive sentences was the fact that appellant engaged in the "egregious conduct" for over a month); *State v. Richard L. Meyer*, No. 01C01-9902-CC-00034, 1999 WL 994046, at *2 (Tenn. Crim. App. Nov. 3, 1999) (in finding that appellant clearly qualified for consecutive sentencing, court noted that abuse of the victim lasted for several months and included digital penetration).

The trial court reviewed the acts of sexual abuse against the victim in this case, finding them concerning, but not as egregious as some cases that have been reported. We agree with the trial court's assessment. Our state courts have attempted to delineate the severity of sexual abuse that will warrant application of consecutive sentencing. *See State v. Osborne*, 251 S.W.3d 1, 28 (Tenn. Crim. App. 2007) (concluding that evidence of sexual acts including cunnilingus, fellatio, digital penetration, and masturbation was sufficient to support imposition of consecutive sentencing); *but cf. State v. Cleander Cleon Hartman Jr.,* No. M2000-02441-CCA-R3-CD, 2002 WL 65996, at *17 (Tenn. Crim. App. Jan. 17, 2002) (consecutive sentencing not warranted where contact was limited to touching and fondling, never escalated, and did not involve penetration or oral contact). We conclude that the abuse the victim suffered in this case is of the more severe nature described in *Osborne*.

Finally, while the State did not present psychological evidence regarding the emotional and mental harm to the victim, the trial court credited the victim's testimony at trial about the impact the abuse had on him on a daily basis. As we have previously noted,

> [b]ased on our review of the record, a combination of concurrent and consecutive sentences is appropriate in relation to the severity of the offenses and are the least severe measures necessary to deter [appellant's] future criminal conduct, to protect society, and to deter others who are similarly situated and may be likely to commit similar offenses.

*Osborne*, 251 S.W.3d at 28-29. The trial court did not err in imposing consecutive sentences.

## C. Sufficiency of the Evidence

Appellant claims that the State's convicting evidence was entirely circumstantial and was insufficient to support his convictions. The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant's argument that if the evidence against him was sufficient, "it was only by the thinnest of margins," is unpersuasive. Viewing the evidence in the light most favorable to the State, the victim offered specific testimony regarding the acts of abuse that he endured. He testified about appellant attempting to masturbate him both with his hand and by placing the victim's penis in his mouth; about being forced to use his hand to masturbate appellant; about being forced to perform oral sex on appellant; about appellant's ejaculating in his mouth; and about being forced to assume a position involving mutual masturbation. The victim explained the positioning of appellant during these acts, as well as his own positioning. The State produced evidence of appellant's semen located on the ottoman and the surrounding carpet where the victim alleged that the incidents took place.

Appellant presented contradictory evidence on several points of the victim's testimony. He attempted to explain away how the victim knew that semen was embedded on the ottoman and carpet. The jury obviously discredited appellant's contention that he told his young adopted son that he and his wife caused the bodily fluid to be deposited in that location during their sexual activities. Appellant presented an expert to establish the unlikelihood of appellant being able to sexually perform in certain positions. The jury had before it sufficient evidence by which to convict appellant of the offenses.

### D. Harmless Error Analysis

Appellant cites *Gilliland* for the proposition that "the line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt." *Gilliland*, 22 S.W.3d at 273. The statement by the *Gilliland* court pertained to appellate review of joinder and severance. Indeed, the majority of the cases that cite the same proposition, almost *verbatim*, do so in the context of joinder and severance. *See, e.g., State v. Garrett*, 331 S.W.3d 392, 405 (Tenn. 2011); *State v. Shirley*, 6 S.W.3d 243, 250 (Tenn. 1999); *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979). Joinder and severance are not at issue in this case, despite appellant's argument, *supra*, that the mention of appellant's engaging in sexual relations with another individual constituted a de facto joinder of the severed offenses.

Rather, we treat appellant's final argument as a prompting for this court to engage in a "cumulative effect of errors" analysis.

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted). Upon thorough review of the record, we do not find that any errors committed in appellant's trial "lend themselves to being aggregated" to establish that he did not receive a fair trial or sentencing hearing. *Id.* at 77. Appellant is not entitled to relief on this issue.


## CONCLUSION

Upon consideration of the parties' briefs, the oral arguments of counsel, and the record as a whole, we affirm the judgments of the trial court.

_____

ROGER A. PAGE, JUDGE